# **EXHIBIT A**

LEASE

dated as of March *11,* 2023

BNN FULTON FLUSHING OWNER LLC,

as Landlord

and

Elfand Organization LLC DBA Empire Cannabis Club/Door to Door 420

as Tenant

Affecting the premises commonly known as:

446-448 Fulton St.

Brooklyn, New York

# TABLE OF CONTENTS

Page

1. THE DEMISED PREMISES AND LEASE TERM ................................................................. 1
2. RENT ................................................................................................................................ 2
3. NO COUNTERCLAIM OR ABATEMENT ................................................................ 3
4. USE OF DEMISED PREMISES ................................................................................. 3
5. CONDITION OF DEMISED PREMISES ................................................................... 5
6. MAINTENANCE, REPAIR AND ACCESS ............................................................... 5
7. ALTERATIONS ........................................................................................................... 7
8. TAXES ........................................................................................................................... 8
9. COMPLIANCE WITH REQUIREMENTS ............................................................... 10
10. LIENS ......................................................................................................................... 11
11. PERMITTED CONTESTS ......................................................................................... 11
12. UTILITY SERVICES ................................................................................................. 11
13. INSURANCE .............................................................................................................. 12
14. INDEMNIFICATION ................................................................................................. 14
15. DESTRUCTION; FIRE OR OTHER CAUSE ........................................................... 15
16. EMINENT DOMAIN ................................................................................................. 16
17. QUIET ENJOYMENT ................................................................................................ 17
18. RIGHT TO CURE TENANT'S DEFAULT ............................................................... 18
19. EVENTS OF DEFAULT AND TERMINATION ...................................................... 18
20. REMEDIES AND DAMAGES .................................................................................. 19
21. FEES AND EXPENSES ............................................................................................. 25
22. VAULT, VAULT SPACE AREA ............................................................................... 25
23. ACCESS TO PREMISES ........................................................................................... 25
24. SURVIVAL oF TENANT'S OBLIGATIONS AND DAMAGES ............................. 26
25. INJUNCTION ............................................................................................................. 26
26. ESTOPPEL CERTIFICATES .................................................................................... 26
27. REMEDIES CUMULATIVE ..................................................................................... 27
28. ASSIGNMENT, SUBLETTING AND MORTGAGES ............................................. 27
29. SUBORDINATION AND ATTORNMENT ............................................................... 29
30. CONVEYANCE BY LANDLORD; LIMITATION ON LIABILITY .......................... 30

i

# TABLE OF CONTENTS
(continued)

**Page**

31. NO MERGER OF TITLE ........................................................................... 31

32. ACCEPTANCE OF SURRENDER ............................................................ 31

33. END OF LEASE TERM ............................................................................ 31

34. OPTION TO EXTEND LEASE TERM ..................................................... 32

35. BROKERAGE ........................................................................................... 32

36. HAZARDOUS MATERIALS .................................................................... 32

37. CHEMICAL WASTE ................................................................................ 34

38. DEFINITIONS .......................................................................................... 35

39. NOTICES .................................................................................................. 37

40. SIGNS ....................................................................................................... 37

41. ADJACENT EXCAVATION-SHORING ................................................. 38

42. MISCELLANEOUS ................................................................................. 38

43. CERTIFICATE OF OCCUPANCY .......................................................... 40

44. SECURITY DEPOSIT .............................................................................. 40

45. LANDLORD'S RIGHT TO RECLAIM UPPER FLOORS ..................... 44

46. GUARANTY .............................................................................................. 44

47. DEMOLITION .......................................................................................... 44

EXHIBIT A – DIAGRAM SHOWING THE DEMISED PREMISES

EXHIBIT B – PROHIBITED USES

EXHIBIT C – COMMENCEMENT DATE AGREEMENT

EXHIBIT D - GUARANTY

EXHIBIT E – FORM OF LETTER OF CREDIT

66938335v.5

**LEASE**

AGREEMENT OF LEASE (this "Lease"), dated March 22, 2023, between BNN FULTON FLUSHING OWNER LLC, a New York limited liability company, having an address c/o Braha Industries 10 West 33rd St., Suite 220, New York, NY 10001 ("Landlord"), and Elfand Organization LLC DBA Empire Cannabis Club/Door to Door 420, a New York limited liability company, having an address at 147 8th Avenue, New York, NY 10011 ("Tenant").

## 1.    THE DEMISED PREMISES AND LEASE TERM

In consideration of the Rent hereinafter reserved and the terms, covenants and conditions set forth in this Lease to be observed and performed by Tenant, Landlord hereby demises and leases to Tenant, and Tenant hereby rents and hires from Landlord the entire building consisting of the cellar, ground floor, second floor, third floor, and fourth floor premises, as more particularly described in Exhibit A attached hereto and made a part hereof (the "Premises") commonly known as and by the street address of 446-448 Fulton St., Brooklyn NY , New York (the "Building"). Landlord does not represent the actual square footage of the Premises and no measurement of the Premises at any time during the Term shall result in a reduction in the "Fixed Rent" (as hereinafter defined) payable pursuant to Sections 2 and 34 below. Notwithstanding anything to the contrary contained herein, the space (which may include vault space) presently occupied by "Subway Shoe Repair" shall not be included in the Premises.

TO HAVE AND TO HOLD the Premises unto Tenant, and the permitted successors and assigns of Tenant, upon and subject to all of the terms, covenants and conditions herein contained.

A.    The initial term of this Lease (the "Initial Term") shall commence upon the "Commencement Date" (as hereinafter defined) and expire (the "Expiration Date") on the tenth (10th) anniversary of the Rent Commencement Date (as hereinafter defined) or, if extended by Tenant pursuant to Article 34, the fifteenth (15th) anniversary of the Rent Commencement Date provided, if the Rent Commencement Date is not the first day of a month, such Expiration Date will be the last day of the month in which the applicable anniversary (i.e., 10th or 15th) of the Rent Commencement Date occurs.  For purposes of this Lease, the term Initial Term, together with the Extended Term (as such term is defined in Section 34) if applicable, shall collectively be referred to herein, as the "Term" or "Lease Term").

B.    The "Rent Commencement Date" shall be one hundred twenty (120) days following the Commencement Date.

C.    The "Commencement Date" shall mean the Effective Date. The Effective Date shall be **April 1, 2023**.

D.    At the request of either party, the parties hereto shall enter into a supplemental certificate fixing the Commencement Date, the Rent Commencement Date, the Expiration Date, and all other pertinent terms set forth in this Lease in the form which is annexed hereto as <u>Exhibit C</u>, but the failure of the parties to sign such certificate shall not affect the Commencement Date, Rent Commencement Date or the enforceability of this Lease upon Tenant.

## 2.   RENT

A.   Upon the Rent Commencement Date, Tenant promises to pay to Landlord the rent reserved under this Lease, which shall consist of:

(i)   annual fixed rent (hereinafter, the "Fixed Rent") for the Initial Term shall be as follows:

| Lease Year | Annual | Monthly |
|---|---|---|
| 1 | $600,000.00 | $50,000.00 |
| 2 | $615,000.00 | $51,250.00 |
| 3 | $630,375.00 | $52,531.25 |
| 4 | $646,134.37 | $53,844.53 |
| 5 | $662.287.71 | $55,190.64 |
| 6 | $678,844.89 | $56,570.41 |
| 7 | $695,816.00 | $57,984.67 |
| 8 | $713,211.40 | $59,434.29 |
| 9 | $731,041.68 | $60.920.14 |
| 10 | $749,317.72 | $62,443.15 |

For clarification and not limitation, no Fixed Rent or Taxes shall be due until the Rent Commencement Date; provided, however, from and following the Commencement Date, Tenant shall be liable for all other charges payable by Tenant under this Lease, including, without limitation, all water and sewer charges, all fuel (if applicable), electricity, gas, and other utility charges which may be incurred at the Premises.

(ii)   all other sums of money as shall become due and payable by Tenant under this Lease (hereinafter, "Additional Rent"), all of which sums shall be payable as hereinafter provided. If any installment of Fixed Rent, or if any Additional Rent required pursuant to the provisions of this Lease to be paid by Tenant is not paid within ten (10) days after the date due then, in either case, such late installment shall bear interest at the  lesser of (i) five percent (5%) for the first thirty (30) days as to which interest is due and ten percent (10%) thereafter and (ii) the maximum rate permitted by applicable Law (the "Interest Rate") from the date said installment was due and payable until the date said amount is paid in full, said interest to be deemed Additional Rent.

66938335v.5

B.    The Fixed Rent shall be payable in advance in equal monthly installments on the first (1st) day of each calendar month during the Lease Term. If the Rent Commencement Date is not the first day of a month, the Fixed Rent for the month in which the Rent Commencement Date occurs shall be appropriately apportioned on a per diem basis.

C.    Tenant shall pay all Fixed Rent and Additional Rent (collectively, "Rent") due hereunder at the office of Landlord or such other place as Landlord may notify Tenant in writing, with the payments made out to Landlord, payable in United States legal tender, by, at Landlord's election, (i) wire transfer of immediately available funds pursuant to wiring instructions provided by Landlord therefor or (ii) cash, or good and sufficient check, and shall be payable, in advance, in equal monthly installments on the first day of every month, without any prior notice, demand, off-set, deduction or abatement whatsoever, at the office of Landlord as set forth above, or at such place and to such person as Landlord from time to time may notify Tenant in writing. If this Lease were to terminate (as distinguished from expire and for a reason other than a Tenant default) on a day other than the last day of a calendar month, the Fixed Rent shall be pro-rated on a per diem basis.

### 3.    NO COUNTERCLAIM OR ABATEMENT

All Rent shall be absolutely net to Landlord so that this Lease shall yield to Landlord the full amount of the installments thereof throughout the Lease Term without any setoff, abatement, reduction or deduction, whatsoever, except as may be specifically provided for in this Lease. All Fixed Rent shall be paid to Landlord without notice or, demand and all Rent shall be paid without counterclaim, setoff or deduction and nothing shall suspend, defer, diminish, abate or reduce any Rent, except as otherwise specifically provided in this Lease.

### 4.    USE OF DEMISED PREMISES

A.    Tenant covenants to use the Premises for a State legal cannabis concierge club and other uses customarily incidental and ancillary thereto ("Intended Use") and for no other use or purpose, provided, however, in no event shall Tenant use the Premises for the prohibited uses described in <u>Exhibit B</u> attached hereto and made a part hereof (the "Prohibited Uses") except in the reasonable and usual course of business under the Intended Use. Landlord shall not have the right to terminate this Lease for Tenant's Intended Use being illegal under Federal Law unless a federal agency enforces a closure of the Premises. In the event that the law in the State of New York changes so that Tenant is no longer able to operate  the Premises with the Intended Use then Tenant shall provide Landlord with notice that that the Lease shall be terminated three (3) months from the date of said notice.  In such event, Landlord shall retain the Security Deposit (i.e. 3 months' Fixed Rent) and Tenant shall pay one additional month's Fixed Rent and this Lease shall thereafter be terminated.

B.    Tenant shall not do or permit any act or thing which is contrary to any Legal Requirements (hereinafter defined). Tenant shall not use, or allow the Premises or any part thereof or any improvements now or hereafter erected thereon or any appurtenances thereto to be used or occupied for any unlawful purpose or for the Prohibited Uses, and shall not do, or suffer any act to be done by persons under its reasonable control or any condition to exist within the Premises or any part thereof, or in any improvements now or hereafter erected or on any appurtenance to the

3

Premises, or permit any article to be brought therein, which may be dangerous, unless safeguarded as required by law, or which may constitute a nuisance, public or private, or which may make void or voidable any insurance in force with respect thereto. Tenant shall not cause or permit objectionable or unusual odors or fumes to emanate from the Premises or which would increase the fire or other casualty insurance rate on the Premises over the rate which would otherwise then be in effect or which would result in insurance companies of good standing refusing to insure the building or any of such property in amounts reasonably satisfactory to Landlord. In the event that Tenant discovers that any activities in violation of this Section shall be occurring in or upon the Premises, or any portion thereof, whether by any Tenant or subtenant of Tenant, Tenant covenants and agrees, at Tenant's sole cost and expense, to promptly take all necessary steps to effectuate the discontinuance of such use (including, without limitation, seeking a temporary restraining order and an injunction).

C.    Tenant shall operate its business in such manner and at such hours as Tenant considers proper in Tenant's judgment. Nothing set forth in this Lease shall be construed, in any manner whatsoever, as an express or implied covenant on the part of Tenant to continuously operate any business operations in the Premises. Notwithstanding any other provision of this Lease, Tenant may close its business operations at the Premises for any period of time, so long as Tenant continues to pay Fixed Rent, Additional Rent, and all other charges payable under this Lease. Notwithstanding the foregoing, if Tenant shall (i) vacate, abandon, or desert the Premises or (ii) cease operating or conducting its business therein for more than ninety (90) consecutive days, except during any Temporary Cessation (as hereinafter defined), then and in any of such events (hereinafter collectively referred to as "failure to do business"), Landlord shall have the right, at its option, to elect to terminate this Lease and recapture the Premises by at least thirty (30) days' notice given to Tenant, which notice shall specify a date for the termination of this Lease (the "Recapture Termination Date"). Upon the Recapture Termination Date, this Lease and the term thereof shall end and expire as fully and completely as if such date were the date set forth herein as the stated expiration date of the term of the Lease, unless, however, Tenant shall have fully reopened for business in the Premises prior to the expiration of the thirty (30) day notice period. Tenant shall thereupon quit, surrender and vacate the Premises without prejudice however to Landlord's rights and remedies against Tenant under the Lease provisions in effect prior to the Recapture Termination Date or with respect to periods prior to the Recapture Termination Date, and any Fixed Rent, Additional Rent and any other charge payable under this Lease owing shall be paid up to such date and any payments of Fixed Rent made by Tenant which were on account of any period subsequent to such date shall be returned to Tenant within thirty (30) days of such surrender. As used herein, the term "Temporary Cessation" shall mean a temporary closing or temporary discontinuance of the operation of Tenant's business in the Premises as reasonably required for the following reasons: (i) due to the taking by eminent domain as provided for in accordance with the terms of Article 16 hereof, (ii) due to fire or casualty as provided for in accordance with the terms of Article 15 hereof, (iii) for conducting major repairs or Alterations to the Premises in accordance with the terms of this Lease whereby the Premises cannot reasonably remain open or (iv) Unavoidable Delays. No closing shall relieve Tenant from the obligation to pay Fixed Rent, Additional Rent or any other charge accruing under this Lease, except as expressly otherwise set forth in this Lease.

4

D.     Tenant shall not (i) conduct or permit any fire auction, going out of business or bankruptcy sale in the Premises, or (ii) distribute handbills or other matter to customers outside the Premises.

E.     Tenant shall not do or suffer any waste, damage, disfigurement or injury to the Premises by persons under its reasonable control.

F.     Tenant, at Tenant's sole cost and expense, shall (i) engage a rubbish removal contractor of Tenant's selection, for the removal of all rubbish, debris and waste from Tenant's operation on a regular basis as needed for Tenant's operations; (ii) not, under any circumstances, place such refuse outside the Premises for collection and (iii) cause all waste to be compacted to the maximum extent feasible and placed in securely sealed plastic bags or similar containers in a reasonably adequate area specifically designated by Landlord for refuse and waste or other reasonable location designated by Landlord, and in any event in compliance with all applicable Legal Requirements.

## 5.     CONDITION OF DEMISED PREMISES

A.     Tenant specifically acknowledges and agrees that this Lease and Tenant's obligation to pay Rent as of the Rent Commencement Date shall not be delayed or affected by the Tenant's completion or failure to complete Tenant's improvements to the Premises. Subject to the provisions of this Lease, Tenant shall accept the Premises in "as is" condition. Tenant acknowledges that, except as expressly set forth in this Lease, Landlord makes no representation or warranty, express or implied in fact or by law, as to the nature or condition of the Premises or Building or its fitness or availability for any particular use, or the income to be derived from or expenses of operation of the Premises.

B.     Landlord shall have no obligation whatsoever to alter, improve, decorate or otherwise prepare the Premises for Tenant's occupancy. Tenant acknowledges and agrees that Landlord has not made, and does not make, any representation or warranty, and Landlord shall have no further obligation with respect to any matter relating to the delivery of the Premises. Notwithstanding the foregoing, Landlord shall deliver the Premises with two (2) existing rooftop HVAC units in good working order. Landlord shall also provide credit to Tenant in the amount of $7,500.00 for the installation of new flooring. In addition, Landlord shall provide a credit to Tenant in the amount of $5,000.00 for the repair of the cracked windowpane and water leak damage on the first floor, unless Landlord elects to repair same within thirty (30) days of the date hereof. The foregoing credits shall be applied to the second month's Rent due hereunder.

## 6.     MAINTENANCE, REPAIR AND ACCESS

Tenant, at all times during the Term and at Tenant's expense, shall except to the extent set forth in (ii) below, keep the interior and exterior of the Premises, and all facilities and equipment located therein, and the storefront and Signs, clean, in good order and condition, in compliance with all Legal Requirements, and promptly shall make all necessary or appropriate repairs, replacements and renewals thereof. Furthermore, Tenant shall make all repairs, maintenance and replacements required with respect to the heating, ventilation, air conditioning, electrical and plumbing systems and any rooftop or exterior air conditioning or HVAC units,

5

plumbing fixtures serving the Premises (including sinks and toilets) and the plumbing lines, valves, and pipes connected to or running from such fixtures to the point at which such lines, valves and pipes connect to the public water and sewer lines serving the Building, fire sprinkler system (including, without limitation, sprinkler heads) and the repair, replacement, renewal or maintenance of any or part of the Premises in compliance with all Legal Requirements to the extent such repair, replacement, renewal or maintenance is not explicitly Landlord's obligation pursuant to subsection (ii) below; provided, however, Tenant shall not be responsible for (A) replacement of the roofing system or (B) any repairs or maintenance required because of the gross negligence or willful misconduct of Landlord or Landlord's employees, agents or contractors. Tenant shall keep all water and sewer mains and roof drains free from obstruction at all times and shall make arrangements for Tenant's garbage removal at Tenant's sole cost and expense. Tenant shall keep the Premises in a clean and sanitary condition, free from vermin and escaping odors. Tenant, at Tenant's sole cost and expense, shall arrange for professional extermination services as necessary. If the Premises are or become infested with vermin or other pests, Tenant shall, at Tenant's sole cost and expense, cause the same to be exterminated from time to time to the satisfaction of Landlord.

    A.

    (ii)    Landlord shall be responsible only for the structural repair of the Building and the roof (including, the roof membrane and roof drainage system), foundation, floor slab and exterior and load bearing walls and columns. **Tenant shall be obligated to keep roof drains free from debris or obstruction**. Landlord's aforesaid obligation shall be performed at the expense of Tenant to the extent that the need for same arises out of a Tenant Omission. A "Tenant Omission" shall mean Tenant's failure to perform its obligations under this Lease after applicable notice and cure periods, or the gross negligence, willful or tortuous conduct of Tenant, its agents, servants, employees or invitees.

    (iii)    Tenant shall be solely responsible, at all times during the Term, for the removal of snow, ice, dirt and debris from, the sidewalk in front of and immediately adjacent to the Premises as well as the repair of the sidewalk in front of and immediately adjacent to the Premises. Landlord shall be responsible for the replacement of the sidewalk unless such replacement requirement arises due to a Tenant Omission.

    (iv)    All repairs, replacements and renewals by Tenant or Landlord shall be performed in a good and workmanlike manner using materials of good quality and shall be performed in accordance with all Legal Requirements.

    B.    Landlord may install scaffolding or a sidewalk bridge in front of and adjacent to the Building in connection with work Landlord may be performing to the Building or portions thereof during the Lease Term. Tenant agrees that the installation of such sidewalk bridge or scaffolding, or the work performed by Landlord, shall not subject Landlord to any liability to Tenant or give Tenant any right of offset, reduction or claim against Landlord. Landlord agrees, however, that Landlord will, at no cost to Tenant, install temporary signage of Tenant, as provided by Tenant, provided same complies with applicable Legal Requirements. Landlord shall remove any such scaffolding or sidewalk bridge promptly after Landlord has completed the work which caused the need for the installation of such sidewalk bridge scaffolding.

C.    Tenant shall, with coordination therefor, permit Landlord, Landlord's agents and public utilities servicing the Building to erect, construct, use and maintain, concealed ducts, pipes, conduits, supports, beams, scaffolding and wiring, in and through the Premises in locations, to the extent reasonably necessary and in compliance with applicable Legal Requirements, which do not interfere, except  to a de minimis extent, with Tenant's use thereof nor which reduce the size, dimensions or usable area of the Premises, except to a de minimis extent, as Landlord may deem necessary or desirable for the Premises or for any portion of the Building, provided that Landlord repairs any damage caused by such work and restores the Premises to its condition immediately prior to the performance of such work, subject to compliance with applicable Legal Requirements. Landlord shall have the non-exclusive access to all parts (except surfaces facing the interior of the Premises) of all walls (except interior walls and storefront), windows and doors bounding the Premises (including exterior Building walls, core corridor walls, doors and entrances), all space adjacent to or in the Premises used for shafts, stacks, stairways, chutes, pipes, conduits, ducts, fan rooms, heating, air cooling, plumbing and other mechanical facilities, service closets and other Building facilities, together with Tenant, as well as, subject to the terms hereof, access thereto through the Premises, for the purposes of maintenance, alteration and repair.  Landlord shall give Tenant reasonable advance notice of at least 48 hours and shall reasonably coordinate with Tenant before commencing any repairs, alterations, improvements or additions in or to the Building, except in the event of an emergency, in which case Landlord shall nevertheless attempt to notify Tenant telephonically to the extent reasonably practicable.

## 7.    ALTERATIONS

A.    Landlord's Consent.  Tenant shall not make any additions, alterations, installations or improvements ("*Alterations*") in or to the Premises without Landlord's prior written consent. Notwithstanding the foregoing, and subject to the other applicable provisions of this Article VIII, Tenant may make cosmetic, non-structural additions, alterations, installations or improvements which do not affect utility services or plumbing and electrical lines in or to the interior of the Premises, without Landlord's prior written consent, provided that the aggregate cost is no greater than $40,000.00.

B.    Plans.  Tenant's plans and specifications and all of Tenant's work shall be done in a good and workmanlike manner and in compliance with all rules, codes, ordinances, laws, regulations, requirements, orders and directions of any and all governmental agencies and of all municipal departments, bureaus, boards, officials and authorities having jurisdiction thereof, and with the requirements of the National Board of Fire Underwriters and any other agencies having jurisdiction, so as not to increase the fire insurance rates applicable to the Building.

C.    Permits.  Prior to commencing any Alterations, Tenant, at its sole cost and expense, shall obtain all permits, approvals and certificates required by any governmental or quasi-governmental bodies and shall obtain a certificate of completion or its equivalent and promptly deliver duplicates of all such permits, approvals and certificates to Landlord.

D.    Workmanship.  With respect to all Alterations, all materials shall be new, and both workmanship and materials shall be of good quality; all architects, contractors, subcontractors, materialmen and workmen shall be duly licensed and skilled in their profession and trades and first approved in writing by Landlord.

7

E.     Mechanic's Liens.  With respect to all Alterations, Tenant agrees to obtain and deliver to Landlord, written and unconditional waivers of Lien claims upon the Property and the Premises, for all work, labor and services to be performed and materials to be furnished in connection with such work, signed by all contractors, subcontractors, materialmen and laborers who become involved in such work.

F.     Indemnification.  Tenant hereby agrees to indemnify and hold harmless Landlord and any mortgagee(s) having an interest in the Premises, from and against any and all suits, actions, damages, losses, claims, liabilities, and expenses, including reasonably and actually incurred attorneys' fees, which may arise as a result of or due to any Alterations contemplated hereunder, whether same are as a result of acts or omissions of Tenant, its agents, employees, the architect, the general contractor, or any subcontractor, supplier or materialman.

G.     Ownership.  Any Alterations made or placed in or upon the Premises by the Tenant, as well as all fixtures attached to or installed in connection with Tenant's use of the Premises shall immediately become the property of the Landlord and at the expiration or other termination of this Lease shall be surrendered to the Landlord, unless Landlord, by notice to Tenant no later than thirty (30) days prior to the date fixed as the termination of this Lease or to the expiration date of this Lease, elects to have them removed by Tenant, in which event the same shall be removed from the Premises by Tenant forthwith at its sole cost and expense.

H.     Removal.  Nothing in this Article shall be construed to prevent Tenant's removal of movable furniture, personal property or trade fixtures.  Upon removal of such movable furniture, personal property or trade fixtures and upon removal of other installations as may be required by Landlord, Tenant shall immediately and at its sole cost and expense repair and restore the Premises to the condition existing prior to such installation and shall repair any damage to the Premises or the Building due to such removal.  All property permitted or required to be removed by Tenant at the end of the Term remaining in the Premises after the end of the Term shall be deemed abandoned and may be removed from the Premises by Landlord at Tenant's expense, which right of Landlord shall survive the expiration of this Lease.

## 8.     TAXES

A.     For the purposes of this Lease, the following terms shall have the following meanings:

(i)     The term "Impositions" or "Taxes" shall mean all real property taxes, governmental levies, municipal taxes, county taxes, business improvement district charges, payments in lieu of taxes pursuant to any agreement entered into by Landlord in respect of the Premises, or any other governmental charge, general or special, ordinary or extraordinary, unforeseen as well as foreseen, of any kind or nature whatsoever, which are or may be assessed, levied or imposed upon all or any part of the Real Property (Kings County, Block 156, Lot 26) , under the laws of the United States, the State of New York, City of New York or any political subdivision thereof (but excluding any income, franchise, inheritance, estate, transfer, succession, corporate, gains, inheritance, excise, excess profit or gift taxes).  If any assessments may be payable in installments, the term "Impositions" or "Taxes" for any period shall only include the installments payable during such period and interest charged by the taxing authority.  Further, the

8

term "Imposition" or "Taxes" shall not include late payment charges of the taxing authority, unless Tenant has not timely paid "Tax Rent" (as hereinafter defined) hereunder.    If because of any change in the taxation of real estate, any other tax or assessment (including, without limitation, any occupancy, gross receipts or rental tax) is imposed upon Landlord or the owner of the Real Property or the occupancy, rents or income therefrom, in substitution for, in lieu of or in addition to, any of the foregoing Taxes, (such as, for example, the Florida sales tax on rents, the Michigan single business tax, the City of Los Angeles gross receipts tax on rents, or the Philadelphia City or School District gross receipts tax, as such taxes are presently computed), such other tax or assessment shall be deemed part of the Taxes, provided the same shall be calculated as if the Real Property were the only property of Landlord, and provided further that the same are imposed on lessors of real property as a class.    Further, all reasonable and actually incurred expenses including, without limitation, attorneys' fees and disbursements, experts, and other witnesses, fees, incurred in contesting the validity or amount of any Taxes or in obtaining a refund of Taxes shall be considered as part of the Taxes for such year.    The Taxes shall be initially computed on the basis of the assessed valuation in effect at the time Landlord's Statement (hereinafter defined) is rendered (as Taxes may have been settled or finally adjudicated prior to such time) regardless of any then pending application, proceeding or appeal respecting the reduction of any such assessed valuation, but shall be subject to subsequent adjustment as hereinafter provided.

(ii)    "Landlord's Statement" shall mean a calculation of Tax Rent for a Tax Year payable including a copy of the Tax bill for the Tax Year or other evidence from the City of New York as to the amount of Taxes due in such Tax Year.

(iii)    Tenant's Proportionate Share shall mean 100%.

(iv)    "Tax Year" shall mean the period July 1-June 30 or such other period as may be adopted by the City of New York or other taxing authority for the fiscal year for assessing taxes.

(v)    "Assessed Valuation" shall mean the transitional amount for which the Real Property is assessed pursuant to applicable provisions of the New York City Charter and of the Administrative Code of the City of New York for the purpose of imposition of Taxes.

B.    Tenant shall pay to Landlord, as Additional Rent, during each Tax Year occurring during the Term of this Lease, Tenant's Proportionate Share of any and all increases in Taxes assessed, levied or imposed during, or with respect to, such Tax Year or any part thereof ("Tax Rent") over the 2023/2024 base Tax Year.    Tax Rent for the Tax Year in which the Commencement Date or Expiration Date occurs shall be appropriately adjusted.

C.    (i)    At any time prior to, during or after any Tax Year, Landlord may render to Tenant, a Landlord's Statement showing the amount of Tax Rent. Landlord's failure to render a Landlord's Statement during or with respect to any Tax Year shall not prejudice Landlord's right to render a Landlord's Statement during or with respect to any subsequent Tax Year.

(ii)    Within thirty (30) days after delivery of the Landlord's Statement, Tenant shall pay to Landlord the amount due Landlord as shown on such Landlord's Statement, provided however, Tenant shall not be required to pay any Taxes corresponding to such amounts more than

9

thirty (30) days before such amounts are due to the City of New York.

D.     Only Landlord shall have the right to contest Taxes.  In the event that the Assessed Valuation which had been utilized in computing Taxes for a Tax Year is reduced (as a result of settlement, final determination of legal proceedings or otherwise), and as a result thereof a refund or credit of Taxes is actually received by or on behalf of Landlord, then, promptly after receipt of such refund, Landlord shall send Tenant a revised Landlord Statement recalculating Tax Rent for such Tax Year (taking into account reasonable third party expenses, including reasonable attorneys' fees and disbursements, experts and other witnesses, fees, incurred in contesting the validity or amount of any Taxes or obtaining a refund of Taxes) and setting forth Tenant's refund or credit of Tax Rent, if any, and Tenant shall be entitled to receive such refund or credit by way of a credit against the Rent next becoming due after the sending of such Landlord's Statement (or if such refund or credit takes place during the last month of the Term, paid to Tenant at the end of the Term, provided Tenant is not in default hereunder after all applicable notice, cure and grace periods); provided, however, that Tenant's share of such refund or credit shall be limited to the amount, if any, which Tenant had theretofore paid to Landlord as Tax Rent for such Tax Year.

E.     Any Landlord's Statement sent to Tenant shall be conclusively binding upon Tenant unless, within one (1) year after such Landlord's Statement is sent, Tenant shall send a written notice to Landlord objecting to such Landlord's Statement and specifying the respects in which such Landlord's Statement is claimed to be incorrect.

## 9.     COMPLIANCE WITH REQUIREMENTS

A.     Tenant at its sole cost and expense shall comply with all Legal Requirements in respect of, or relating to, the Premises or the use and occupation thereof, abate any nuisance in, on or about the Premises caused by or through Tenant, comply with any order or duty on Tenant, and discharge any violations of any Legal Requirements caused by or through Tenant. Tenant shall not do or permit to be done by persons within its reasonable control any act or thing upon the Premises which will invalidate or be in conflict with any of the insurance policies covering the Building and fixtures and property therein; and shall not do, or permit anything to be done by persons within its reasonable control in or upon the Premises, or bring or keep anything therein, except as now or hereafter permitted by the Fire Department having jurisdiction over the Premises, New York Board of Fire Underwriters, New York Fire Insurance Rating Organization or other authority having jurisdiction and then only in such quantity and manner of storage as not to increase the rate for fire insurance applicable to the Building, or use the Premises in a manner which shall increase the rate of fire insurance on the Building or on property located therein, over that in similar type buildings or in effect prior to this Lease.  Any work or installation made or performed by or on behalf of Tenant or any person claiming through or under Tenant pursuant to this Article shall be made in conformity with, and subject to the provisions of, Articles 4 and 7 hereof.

B.     In furtherance of the provisions of Section 9A above, Tenant shall at all times comply with the provisions of Title III of the ADA and make all changes and modifications to the Premises required thereby, internal and external and Tenant shall indemnify and hold Landlord harmless from and against any losses, costs, damages or claims of whatever nature, arising out of or in connection with the compliance requirements set forth in the ADA, relating to design,

renovation, alteration and/or construction of non-structural (and structural, as required above) elements of the Premises.

C.       Tenant shall, at its own cost and expense, secure and maintain throughout the Term, all necessary licenses and permits from the Authority (hereinafter defined) as shall be necessary for, or incidental to, the conduct of its business in the Premises, and shall comply with all Legal Requirements.

## 10.    LIENS

A.       Tenant shall not directly or indirectly create or permit to be created or to remain, and shall discharge, any mortgage, lien, security interest, encumbrance or charge created or caused by Tenant with respect to the Premises or any part thereof, Tenant's interest therein, or any Fixed Rent or other Rent payable under this Lease.

B.       If, in connection with any work being performed by or for Tenant or any subtenant or in connection with any materials being furnished to Tenant or any subtenant, any mechanic's lien or other lien or charge shall be filed or made against the Premises or any part thereof, then Tenant, at Tenant's expense, within thirty (30) days after Tenant receives notice of such lien or charge, shall cause the same to be discharged of record by payment thereof or filing a bond or otherwise. Tenant promptly and diligently shall defend any suit, action or proceeding which may be brought for the enforcement of such lien or charge; shall satisfy and discharge any judgment entered therein within thirty (30) days from the entering of such judgment by payment thereof or filing a bond or otherwise; and, within thirty (30) days after receipt of a reasonably substantiated written demand, shall pay all damages, costs and expenses, including reasonable attorneys' fees, suffered or incurred by Landlord in connection therewith.

## 11.    PERMITTED CONTESTS

Tenant, at Tenant's expense, after prior written notice to Landlord, may contest, by appropriate legal proceedings conducted in good faith and with due diligence, the amount or validity or application, in whole or in part, of any Legal Requirement, provided that: (a) Tenant shall first make all contested payments, under protest if Tenant desires, (b) neither the Premises, nor any part thereof or interest therein, nor any Rent would be in any danger of being sold, forfeited, lost or interfered with; and (c) in the case of a Legal Requirement, Landlord would not be in any danger of any additional civil or criminal liability for failure to comply therewith.

## 12.    UTILITY SERVICES

A.       Landlord shall not be required to furnish any utilities or services to the Premises. Tenant shall pay to the supplier thereof (including Landlord as provided for in this Article 12) for the on-going use and consumption of all utilities, including, without limitation, water, hot water, electricity, plumbing, sewage, gas, fuel, telephone, internet and/or other communication services (collectively, the "Systems"). Tenant shall pay all charges for all public or private utility services and all sprinkler systems and protection services at any time rendered to or in connection with the Premises or any part thereof; shall comply with all contracts relating to any such services; and shall do all other things required for the maintenance and continuance of all such services.

11

B.    Throughout the duration of Tenant's occupancy, Tenant shall keep all utility meters, submeters and equipment in good working order and repair, at Tenant's sole cost and expense, in default of which Landlord may, on thirty (30) days' notice to Tenant and Tenant's failure to cure same within such period, cause such meters, submeters and equipment to be replaced or repaired and collect the reasonable costs thereof from Tenant, as Additional Rent. Tenant shall pay for water consumed (and sewer charges), as Additional Rent within thirty (30) days after demand based upon said meters or submeters readings at the utility company rates, together with the reasonable out of pocket cost of reading any such meter or submeter.

C.    Tenant shall repair and maintain, at Tenant's sole cost and expense, the Systems and equipment servicing the Premises in good working order and condition and shall comply with all applicable Legal Requirements. Except if caused by Landlord's or its employees, agents or contractors willful acts or gross negligence, Landlord shall not be liable to Tenant for any failure, interruption or curtailment of the Systems or any services or utilities furnished thereby; or for injury or damage to persons or property in connection with the provision of such services or utilities, from any cause whatsoever (including, without limitation, acts of God), and no such failure, interruption, curtailment or interference shall constitute an actual or constructive eviction or entitle Tenant to an abatement of, or offset against, Fixed Rent, except as otherwise specifically provided herein.

## 13.    INSURANCE

A.    Tenant, at all times during the Term and at Tenant's expense, shall provide and maintain in full force and by separate policies:

(i)    workers' compensation insurance as required by any applicable law or regulation and in accordance with the laws of the state, territory or province having jurisdiction over Tenant's employees; and employer's liability insurance with statutory limits;

(ii)    comprehensive general public liability insurance (issued by an insurance company licensed to do business in the State of New York and reasonably acceptable to Landlord) written on an occurrence basis covering the Premises and providing coverage of not less than $2,000,000 per occurrence and $3,000,000 aggregate and umbrella liability insurance with a limit of at least $5,000,000 per occurrence. The foregoing limit may be revised from time to time by Landlord to such higher limits as Landlord shall reasonably require. Such insurance shall provide premises/operation coverage for (a) bodily injury, property damage, personal injury and advertising injury and (b) all contractual liability for bodily injury, property damage and personal and advertising injury covering indemnification obligations under this Lease, as well as products/completed operations coverage for any Alteration performed by or on behalf of Tenant;

(iii)    business interruption insurance in the amount of twelve (12) months' Rent payable hereunder;

(iv)    "Special Form" (formerly "All Risk") property insurance, for the full insurable value of Tenant's personal property, furniture, furnishings and fixtures (including, without limitation, betterments and improvements) and any and all leasehold improvements which may be placed on or affixed to the Premises by Tenant , in an amount equivalent to the full

12

replacement cost of said property, defined as the cost to replace or reconstruct new without deduction for physical depreciation. The policy is to be written with a deductible, if any, not to exceed $25,000;

B.     Upon the execution of this Lease and thereafter within ten (10) days after request from Landlord from time to time, Tenant shall deliver to Landlord certificates of insurance with Accord 25 (liability and workers compensation) and Accord 28 (most recent accord form) (property).

C.     If at any time Tenant shall neglect or fail to provide or maintain insurance or to deliver insurance certificates in accordance with this Article 13, Landlord may upon ten (10) days prior notice to Tenant, effect such insurance as agent for Tenant, by taking out policies in companies selected by Landlord, and the amount of the premiums paid for such insurance shall be paid by Tenant to Landlord within thirty (30) days after reasonable substantiated written demand, as Additional Rent. Landlord, in addition to Landlord's other rights and remedies, shall be entitled to recover as damages for any breach of this Article 13 the uninsured amount of any loss, liability, damage, claim, costs and expenses resulting from such failure and suffered or incurred by Landlord.

D.     All policies of insurance required in this Lease shall be maintained with insurance companies permitted to do business in the State of New York and have an A.M. Best's Insurance Rating of A-:VII or better.

E.     All insurance maintained pursuant to the terms of this Lease shall provide that it is primary to and noncontributory with any and all insurance maintained by or afforded to an additional insured under such insurance.

F.     All insurance maintained by Tenant pursuant to this Article 13: (a) shall, except for workers' compensation insurance and insurance on Tenant's Property, name Landlord, Landlord's managing agent, if any, Landlord's mortgagee and ground lessor, if any, of which Tenant has notice, Landlord's property manager and such other parties as reasonably required by Landlord, as additional insureds, as their respective interests may appear, and shall include an effective waiver by the issuer of all rights of subrogation against any named insured or such insured's interest in the Premises or any income derived therefrom; (b) shall provide, to the extent available, that any losses shall be payable notwithstanding any act or failure to act or negligence of Landlord or Tenant or any other person; and (c) shall provide that the insurance carrier shall endeavor to provide at least thirty (30) days written notice to Landlord of any cancellation or reduction in amount. Any such insurance, at Tenant's option, may be provided through a blanket policy or policies, provided that such blanket policy or policies give to Landlord no less protection than that which would be afforded Landlord under the above-described policies.

G.     Each party, on behalf of itself and on behalf of anyone claiming under or through it by way of subrogation or otherwise, waives all rights and causes of action against the other party and such party's employees, agents, officers, directors, licensees, contractors and subcontractors acting on behalf of such party for any liability arising out of any loss or damage in or to the Premises, the Building and the contents therein caused by: (A) any peril normally covered under the Special Form policies described in subsection A(iv) above) (whether or not such party actually

13

carries such insurance policies); or (B) if the scope of coverage is broader than in (A) herein, then any peril actually covered under the property insurance maintained by such party. This release and waiver shall be complete and total even if such loss or damage may have been caused by the negligence of the other party or such party's employees, agents, officers, directors, licensees, contractors and subcontractors acting on behalf of such party and shall not be affected or limited by the amount of insurance proceeds available to the waiving party, regardless of the reason for such deficiency in proceeds including any deductibles or self- insured retentions. If Tenant's insurance carrier prohibits waiver of subrogation, then each party's release and waiver shall become null and void as each waiver is given in consideration for the other. Tenant covenants that, from and after the Commencement Date, its insurance policies will contain waiver of subrogation endorsements, and, if such endorsements for any reason are about to become unavailable, it will give Landlord not less than one (1) month's prior written notice of such impending unavailability. Any limitation on the scope of Tenant's waiver of its rights pursuant to this Section shall in no event be deemed to apply to, nor shall Landlord's rights and benefits under such waiver be impaired or diminished by, a deficiency in insurance proceeds caused by (1) Tenant's failure to carry the insurance required by this Lease or Tenant's election to self-insure; (2) Tenant's election to carry insurance in an amount less than one hundred percent (100%) of replacement cost; or (3) any deductible under any insurance carried by Tenant.

H.      Tenant shall not violate, or permit the violation of, any condition imposed by the insurance maintained by Tenant in this Article 13 and/or the standard fire insurance policy then issued for retail buildings in the City of New York, and shall not do, or permit anything to be done, or keep or permit anything to be kept in the Premises which would subject Landlord to any liability or responsibility for personal injury or death or property damage, or which would increase the fire or other casualty insurance rate on the Premises over the rate which would otherwise then be in effect (unless Tenant pays the resulting premium as hereinafter provided for) or which would result in insurance companies of good standing refusing to insure the building or any of such property in amounts set forth in this Article 13 or otherwise reasonably satisfactory to Landlord.

## 14.    INDEMNIFICATION

A.      Except to the extent any of the following arises from the gross negligence or willful misconduct of one or more of the Indemnitees (hereinafter defined), Tenant shall indemnify, defend and save harmless Landlord, its members, managers, directors, offices, managing agent and mortgagee (collectively, "Indemnitees") from and against (i) all claims of whatever nature against Indemnitees arising from any act, omission or negligence of Tenant, its contractors, licensees, agents, servants, employees, invitees (ii) all claims against Indemnitees arising from any accident, injury or damage whatsoever caused to any person or to the property of any person and occurring during the Term in the Premises, (iii) Tenant's breach of its representations, warranties, covenants and undertakings hereunder, and (iv) all claims against Indemnitees arising from any accident, injury or damage occurring outside of the Premises but anywhere within or about the Real Property, where such accident, injury or damage results or is claimed to have resulted from an act or omission of Tenant or Tenant's agents, employees, visitors or contractors, including, without limitation, any claims arising from any act, omission or negligence of Tenant and its invitees. This indemnity and hold harmless agreement shall include indemnity from and against any and all liability, fines, suits, demands, costs and expenses of any kind or nature incurred in or in connection with any such claim or proceeding brought thereon, and the defense thereof.

14

Landlord, from time to time, may submit to Tenant reasonably substantiated copies of Indemnitees' bills in connection with the foregoing. Tenant within thirty (30) days after receipt of such bills shall pay to Landlord, as Additional Rent, the amount shown on such bills.

B.      If any claim, action or proceeding is made or brought or threatened against Indemnitees, which claim, action or proceeding the Tenant shall be obligated to indemnify against, pursuant to the terms of this Lease, then, Tenant shall receive prompt notice thereof and Tenant, at its sole cost and expense, shall resist or defend such claim, action or proceeding.

C.      The provisions of this Article 14 shall survive the expiration or earlier termination of this Lease.

## 15.    DESTRUCTION; FIRE OR OTHER CAUSE

A.      Tenant shall give prompt written notice to Landlord in case of fire or accident in or about the Premises.

B.      Subject to the provisions of this Article 15, if the Premises shall be damaged by fire or other casualty, the damages shall be repaired by and at the expense of Landlord, promptly after the collection of the insurance proceeds attributable to such damage.

C.      In the event that the Premises has been damaged or destroyed, Landlord shall notify Tenant of Landlord's good faith estimate of the time required to repair such damage after receipt of insurance proceeds ("Tenant's Repair Notice"); such notice shall be furnished to Tenant within sixty (60) days following the casualty occurrence. If, pursuant to Landlord's Repair Notice, the repair of any damage which affects the Premises will take in excess of two hundred ten (210) days following the date of the damage, Tenant shall have the right, by written notice to Landlord delivered within thirty (30) days following the delivery of Landlord's Repair Notice to terminate this Lease. Additionally, if Tenant has not terminated this Lease pursuant to the provisions set forth above and the repairs are not actually completed on or before twelve (12) months following the date of the damage (subject to Unavoidable Delays), Tenant shall have the additional right, upon thirty (30) days' notice, to terminate this Lease by notice given to Landlord at any time prior to the date on which Landlord has substantially completed the repairs, unless Landlord substantially completes such repairs within such thirty (30) day period. Upon termination as aforesaid, this Lease and the Term hereof shall cease and come to an end, any unearned rent or other charges paid in advance by Tenant shall be refunded to Tenant within fourteen (14) days following Tenant's written request to Landlord and Tenant shall surrender the Premises "as is" but shall be allowed a reasonable time, not to exceed thirty (30) days, to remove its salvageable Tenant's Property and all insurance proceeds paid or payable with respect to all or any portion of the Premises shall be paid to Landlord.

D.      If damage or destruction to the Premises is caused by a casualty not required to be insured against and for which insurance proceeds are not available, Landlord may, within sixty (60) days following the casualty either elect to (i) agree in writing to make such repairs and restorations or (ii) terminate this Lease upon not less than thirty (30) days written notice to Tenant. Upon termination as aforesaid, this Lease and the term hereof shall cease and come to an end, any unearned rent or other charges paid in advance by Tenant shall be refunded to Tenant within

fourteen (14) days following Tenant's written request to Landlord, and any and all insurance proceeds paid or payable with respect to all or any portion of the Premises shall be paid to Landlord.

E.     Notwithstanding the foregoing, if any damage or destruction to the Premises shall occur during the last twenty four (24) months of the Initial Term (unless Tenant has already exercised its option to extend the Lease until the Extended Term) or the last twelve (12) months of the Extended Term, and such damage shall take more than thirty (30) days to repair, or when repaired and restored, there shall be less than twelve (12) months left in the Term, this Lease may be terminated at either party's election. Upon termination as aforesaid, this Lease and the term hereof shall cease and come to an end, any unearned rent or other charges paid in advance by Tenant shall be refunded to Tenant within fourteen (14) days following Tenant's written request to Landlord, and any and all insurance proceeds paid or payable with respect to all or any portion of the Premises shall be paid to Landlord.

F.     If Landlord is required to repair or restore the Premises or any part thereof under any provision of this Article and (i) Tenant's use of the Premises is affected and (ii) the damage or destruction to the Premises was not due to the action or omission of Tenant, then until Landlord completes such repair or restoration, Fixed Rent and Additional Rent payable by Tenant shall be abated in proportion to that portion of the Premises that are unusable by Tenant.

G.     Notwithstanding anything to the contrary contained herein, (i) in the event of an insured casualty for which restoration is to occur, Landlord shall receive all insurance proceeds with respect to the Premises and Building (but not Tenant's Property), which proceeds shall be used solely for the payment of the restoration and (ii) Landlord's obligations to reconstruct the Premises and the Building shall not exceed the amount of insurance proceeds and Landlord's deductible, subject, however, to Tenant's right to elect to pay for the costs in excess of the insurance proceeds, in which case Tenant shall pay for the costs after the insurance proceeds are exhausted.

H.     The parties agree that this Article 15 constitutes an express agreement governing any case of damage or destruction of the Premises or the Building by fire or other casualty, and that any law which provides for such contingency in the absence of an express agreement, now or hereafter in force shall have no application in any such case.

## 16.    EMINENT DOMAIN

A.     Each party shall notify the other if it becomes aware that any portion of the Building will be taken in condemnation proceedings or by exercise of any right of eminent domain (any such action being hereinafter referred to as a "Taking"). All payments in respect of Taking shall be payable to Landlord; provided, however, that nothing shall prevent Tenant from making a claim in respect of Tenant's improvements and equipment.

B.     In the case of a Taking that in Tenant's reasonable opinion leaves the remaining portion of the Premises not adequate and suitable for use by Tenant, Tenant may terminate this Lease by service of a written notice upon Landlord within sixty (60) days of Tenant's receipt of

notice of such Taking. (The failure of Tenant to so notify Landlord within the aforesaid sixty (60) day period shall be deemed an election of Tenant not to terminate this Lease). The Taking described in the preceding sentences is herein referred to as a "Total Taking".

C.    In the case of a Taking other than a Total Taking (a "Partial Taking"), this Lease shall remain in full force and effect and the Rent and the Tenant's Proportionate Share shall be equitably adjusted in proportion to the portion of the Premises no longer available for use by Tenant; and Landlord, to the extent of the condemnation award awarded to it, shall proceed with due diligence (i) to perform the repairs and other work necessary to restore the Premises to the condition that they were in immediately prior to the Partial Taking to the extent such Restoration is practical, (ii) to restore reasonable means of access to the Premises and (iii) to erect suitable demising walls. Landlord shall notify Tenant if, and to the extent that, the condemnation award awarded to Landlord shall be insufficient to restore the Premises pursuant to the provisions set forth above, and the parties shall negotiate in good faith to determine how to find such shortfall, but if unable to agree, either Landlord or Tenant shall have the right, by written notice to the other party delivered within ninety (90) days following the delivery of said notice from Tenant, to terminate this Lease, effective as of the date of the physical taking pursuant to such condemnation. In the event that either party fails to terminate the Lease within the time period provided for in the previous sentence, this Lease shall remain in full force and effect, subject to its terms provided for herein.

D.    Notwithstanding anything contained herein to the contrary, if the restoration of the Premises and/or the Building is not commenced within ninety (90) days of Landlord's receipt of the condemnation award or is not completed within twelve (12) months from the date of the Taking, then this Lease may be terminated at either party's election. Upon termination as aforesaid, this Lease and the term hereof shall cease and come to an end, any unearned rent or other charges paid in advance by Tenant shall be refunded to Tenant within fourteen (14) days following Tenant's written request to Landlord, and any and all insurance proceeds paid or payable with respect to all or any portion of the Premises shall be paid to Landlord.

E.    In the event of a Total Taking or Partial Taking, Tenant shall have no claim against Landlord for the value of any unexpired portion of the term of this Lease, nor shall Tenant be entitled to any part of the condemnation award (unless otherwise specified). Nothing herein provided shall preclude Tenant from appearing, claiming, proving and receiving in the condemnation proceeding, Tenant's moving and relocation expenses and the unamortized cost of its leasehold improvements from the condemning authority, provided same does not reduce the award to Landlord.

## 17.    QUIET ENJOYMENT

Landlord covenants that so long as this Lease is in full force and effect and Tenant is not in default hereunder in the payment of any Rent or compliance with or the performance of any of the terms, covenants or conditions of this Lease on Tenant's part to be complied with or performed, beyond applicable notice and cure periods, Tenant shall have use of the Premises and Tenant shall not be hindered or molested by Landlord or any party claiming through or under Landlord or otherwise or any party claiming through or under Landlord in Tenant's enjoyment of the Premises, subject to the provisions hereof.

17

## 18.    RIGHT TO CURE TENANT'S DEFAULT

If Tenant fails to make any payment or to comply with or perform any term, covenant or condition of this Lease to be complied with or performed by Tenant which continues beyond applicable notice and cure periods, Landlord may, but shall be under no obligation to, after fifteen (15) days' notice to Tenant (or upon shorter notice, or without notice, if necessary to meet an emergency situation or time limitation of a Legal Requirement), make such payment or perform or cause to be performed such work, labor, services, acts or things, and take such other steps as Landlord may reasonably deem advisable, to comply with any such term, covenant or condition which is in default. Entry by Landlord upon the Premises for such purpose shall not waive or release Tenant from any obligation or default hereunder. Tenant shall reimburse Landlord for all sums so paid by Landlord and all costs and expenses reasonably incurred by Landlord in connection with the making of any payments, the performance of any act or other steps taken by Landlord pursuant to this Section 19, within thirty (30) days after written demand. All sums so advanced shall bear interest at the Interest Rate from the date paid by Landlord to the day prior to Landlord's receipt of reimbursement thereof.

## 19.    EVENTS OF DEFAULT AND TERMINATION

If any one or more of the following events ("Events of Default") shall occur:

A.    if Tenant shall fail to pay any Fixed Rent within ten (10) days of the date such payment is due (without notice); or

B.    if Tenant shall fail to pay any Rent, other than Fixed Rent, when and as the same becomes due and payable and such failure shall continue for more than twenty (20) days after notice of such failure is given to Tenant; or

C.    intentionally omitted; or

D.    if Tenant shall fail to comply with or perform any other term, covenant or condition hereof, and such failure shall continue for more than thirty (30) days after notice thereof from Landlord, or if such default cannot, with due diligence, be cured within such thirty (30) day period, Tenant within said period, shall not commence with due diligence and dispatch the curing of such default, or, having so commenced, thereafter shall fail or neglect to prosecute or complete with due diligence and dispatch the curing of such default (provided, however, that the aforesaid thirty (30) day period shall be deemed twenty (20) days for the delivery of any certificate required to be provided pursuant to this Lease); or

E.    if Tenant shall admit, in writing, that it is unable to pay its debts as such debts become due; or

F.    if Tenant shall make a general assignment for the benefit of creditors; or

G.    if Tenant shall file a voluntary petition under Title 11 of the United States Code and an order for relief is entered, or if Tenant shall file any petition or answer seeking, consenting to or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under present or any future federal bankruptcy code or any other

18

present or future applicable federal, state or other statute or law, or shall seek or consent to or acquiesce in or suffer the appointment of any trustee, receiver, custodian, assignee, sequestrator or liquidator or other similar official of Tenant or of all or any substantial part of its properties or of the premises or any interest of Tenant therein; or

H.     if within sixty (60) days after the commencement of any proceeding against Tenant seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal bankruptcy code or any other present or future applicable federal, state or other statute or law, such proceeding shall not have been dismissed, or if, within sixty (60) days after the appointment, without the consent or acquiescence of Tenant, of any trustee, receiver, custodian, assignee, sequestrator or liquidator or other similar official of Tenant or of all or any substantial part of its properties or of the Premises or any interest of Tenant therein, such appointment shall not have been vacated or stayed on appeal or otherwise, or if, within thirty (30) days after the expiration of any such stay, such appointment shall not have been vacated; or

I.     if a levy under execution or attachment shall be made against Tenant relating to its interest in the Premises, and such execution or attachment shall not be vacated or removed by court order, bonding or otherwise within sixty (60) days; or

J.     if Tenant shall abandon the Premises.

### 20.     REMEDIES AND DAMAGES

A.     (i)     If an Event of Default shall occur, Landlord, at any time thereafter during the continuance of such Event of Default, at its option, may terminate this Lease and the Term by giving Tenant ten (10) days' notice of such termination, and upon the giving of such notice, this Lease and the Term and all rights of Tenant under this Lease shall expire and terminate as if the date on which the Event of Default occurred were the date herein definitely fixed for the expiration of the Term and Tenant immediately shall quit and surrender the Premises, but Tenant shall remain liable for damages as hereinafter provided.    Anything contained herein to the contrary notwithstanding, if such termination shall be stayed by order of any court having jurisdiction over any proceeding described in subsections G or H of Article 20 hereof, or by federal or state statute then, following the expiration of any such stay, or if the trustee appointed in any such proceeding, Tenant or Tenant as debtor-in-possession shall fail to assume Tenant's obligations under this Lease within the period prescribed therefor by law or within one hundred twenty (120) days after entry of the order for relief or as may be allowed by the court, or if said trustee, Tenant or Tenant as debtor-in-possession shall fail to provide adequate protection of Landlord's right, title and interest in and to the Premises or adequate assurance of the completion and continuous future performance of Tenant's obligations under this Lease as provided in Section L of this Article 20, Landlord, to the extent permitted by applicable law or by leave of the court having jurisdiction over such proceeding, shall have the right, at its election, to terminate this Lease on five (5) days' notice to Tenant, Tenant as debtor-in-possession or said trustee, and upon the expiration of said five (5) day period this Lease shall cease and expire as aforesaid and Tenant, Tenant as debtor-in-possession and/or said trustee shall immediately quit and surrender the Premises as aforesaid.

(ii)     If an Event of Default described herein shall occur, or if this Lease shall be

19

terminated as provided in Section A(i) of this Article 21, Landlord, in addition to any other rights or remedies it may have, shall, after ten (10) days written notice to Tenant, have the right of lawful reentry pursuant to legal proceedings and may remove all persons and property from the Premises and such property, at Landlord's sole discretion, may be disposed of or may be removed and stored in a public warehouse or elsewhere at the cost and for the account of Tenant, without being deemed guilty of trespass, or becoming liable for any loss or damage which may be occasioned hereby unless and to the extent due to the gross negligence or willful misconduct of Landlord.

B.    (i)    If this Lease shall be terminated as provided in Section A(i) of this Article 20 and/or Tenant shall be dispossessed by summary proceedings as provided in Section A(ii) of this Article 20:

(1)    Tenant shall immediately pay Rent due through the date of termination, and any other sums which may be due Landlord hereunder and surrender possession and vacate the Premises and deliver possession thereof to Landlord within five (5) business days following termination, and hereby grants to Landlord full and free license to enter into and upon the Premises in such event with process of law and to expel or remove Tenant and any others who may be occupying or within the Premises, and to remove any and all property therefrom, without being deemed in any manner guilty of trespass, eviction or forcible entry or detainer, and without relinquishing Landlord's rights to Rent or any other right given to Landlord hereunder or by operation of law;

(2)    If Tenant abandons the Premises and same continues after ten (10) days' notice or any other Event of Default occurs, and Landlord elects to terminate Tenant's right to possession only, without terminating the Lease, Landlord may, at Landlord's option, enter into the Premises, remove Tenant's signs and other evidence of tenancy, and take and hold possession thereof without such entry and possession terminating the Lease or releasing Tenant, in whole or in part from Tenant's obligation to pay the Rent hereunder for the full Term, and in any such case Tenant shall pay forthwith to Landlord, a sum equal to the Rent due through the date of termination, plus any other sums then due hereunder. Upon and after entry into possession of the Premises without termination of the Lease, Landlord may, but need not relet the Premises or any part thereof, with or without any furniture that may be therein, as the agent for Tenant, to any person, firm or corporation other than Tenant for such Rent, for such time and upon such terms as Landlord in Landlord's reasonable discretion shall determine; but Landlord shall not be required to accept any tenant offered by Tenant or to observe any instructions given by Tenant about such reletting. In any such case, Landlord may make repairs in or to the Premises to the extent reasonably deemed by Landlord necessary or desirable to maintain the Premises in good condition, and Tenant shall, upon demand, pay the reasonable cost thereof, together with Landlord's expenses of the reletting. If the consideration collected by Landlord upon any such reletting for Tenant's account is not sufficient to pay monthly, the amount of the Rent reserved in the Lease, together with the costs of repairs, and Landlord's expenses, Tenant shall pay to Landlord the amount of each monthly deficiency (the "Deficiency") within fifteen (15) days of reasonably substantiated written demand; and if the consideration so collected from any such reletting is more than sufficient to pay the full amount of the Rent reserved herein, together with the costs and expenses of Landlord, such excess shall be retained by Landlord;

66938335v.5

(3)    Landlord may repair and alter the Premises in such manner as Landlord may reasonably deem necessary or advisable without relieving Tenant of any liability under this Lease or otherwise affecting any such liability, and/or let or relet the Premises or any parts thereof for the whole or any part of the remainder of the Term or for a longer period, in Landlord's name or as agent for Tenant, and out of any rent and other sums collected or received as a result of such reletting Landlord shall: (i) first, pay to itself the reasonable cost and expense of terminating this Lease, reentering, retaking, repossessing, repairing the Premises, or any part thereof, and the reasonable cost and expense of removing all persons and property therefrom, including in such costs, but not limited to, reasonable legal expenses and attorneys' fees and disbursements, (ii) second, pay to itself the cost and expense sustained in securing any new tenants and other occupants, including in such costs reasonable brokerage commissions, legal expenses and attorney's fees and disbursements and other expenses of preparing the Premises for reletting, and, if Landlord shall maintain and operate the Premises, the cost and expense of operating and maintaining the Premises, and (iii) third, pay to itself any balance remaining on account of the liability of Tenant to Landlord.  Landlord in no way shall be responsible or liable to Tenant for any failure to relet the Premises or any part thereof, or for any failure to collect any rent due on any such reletting, and no such failure to relet or to collect rent shall operate to relieve Tenant of any liability under this Lease or to otherwise affect any such liability;

(ii)    No termination of this Lease pursuant to Section 20A(i) or (ii) and no taking possession of and/or reletting the Premises, or any part thereof, pursuant to Section 20A(ii) and Section 20B(i)(2), shall relieve Tenant of its liabilities and obligations hereunder, all of which shall survive such expiration, termination, repossession or reletting, except as expressly set forth herein.

(iii)    At any time after such expiration, termination or repossession, whether or not Landlord shall have collected any current damages as aforesaid, and provided Tenant has theretofore failed to timely pay any Deficiency when due to Landlord, then on and after the second such failure, Landlord, at Landlord's option, shall be entitled to recover from Tenant, and Tenant shall pay to Landlord on demand, as and for liquidated and agreed final damages for Tenant's default and in lieu of all current damages beyond the date of such demand, an amount equal to the excess, if any, of (a) all Rent which would be payable under this Lease from the date of such demand until what would be the then unexpired Term in the absence of such expiration, termination or repossession, over (b) the then fair net rental value of the Premises for the same period, all as discounted to present value at an annual rate equal to the then prevailing discount rate announced by the Federal Reserve Bank.  In determining said fair net rental value, the rent realized by any reletting of the Premises shall be deemed to be said fair net rental value.  Upon the payment of such final damages, this Lease, if not already terminated, shall be deemed terminated.  If any statute or rule of law shall validly limit the amount of such liquidated final damages to less than the amount above agreed upon, Landlord shall be entitled to the maximum amount allowable under such statute or rule of law

C.    In the event of any termination of this Lease under the provisions hereof or under any summary dispossess or other proceeding or action or any provision of law, or in the event that Landlord shall re-enter the Premises under the provisions of this Lease, Tenant shall pay to Landlord as damages, at the reasonable election of Landlord, either:

21

(i)    a sum which at the time of such termination of this Lease or at the time of any such re-entry by Landlord, as the case may be, represents the then value of the excess, if any, of (a) the aggregate of the installments of Fixed Rent and the Additional Rent which would have been payable hereunder by Tenant, had this Lease not so terminated, for the period commencing with such earlier termination of this Lease or the date of any such re-entry, as the case may be, and ending with the date hereinbefore set for the expiration of the Term, over (b) the aggregate fair market rental value of the Premises for the same period (the amounts of each of clauses (a) and (b) being first discounted to present value at an annual rate equal to the then prevailing discount rate announced by the Federal Reserve Bank); or

(ii)    sums equal to the aggregate of the installments of Fixed Rent and Additional Rent which would have been payable by Tenant had this Lease not so terminated, or had Landlord not so re-entered the Premises, payable upon the due dates therefor specified herein following such termination or such re-entry and until the date hereinbefore set for the expiration of the full Term hereby granted; provided, however, that if Landlord shall relet the Premises during said period, Landlord shall credit Tenant with the net rents received by Landlord from such reletting, such net rents to be determined by first deducting from the gross rents as and when received by Landlord from such reletting the commercially reasonable, actual, out-of-pocket expenses incurred or paid by Landlord in terminating this Lease and of re-entering the Premises and of securing possession thereof, including reasonable attorneys' fees and costs of removal and storage of Tenant's property, as well as the commercially reasonable, actual, out-of-pocket expenses of reletting, including repairing, and restoring the Premises for new tenants, brokers' commissions, advertising costs, reasonable attorneys' fees and disbursements, and all other similar or dissimilar expenses chargeable against the Premises and the rental therefrom in connection with such reletting, it being understood that such reletting may be for a period equal to or shorter or longer than the remaining term of this; and provided further, that in no event shall Tenant be entitled to (a) receive any excess of such net rents over the sums payable by Tenant to Landlord hereunder, and  (b) a credit in respect of any net rents from a reletting except to the extent that such net rents are actually received by Landlord.

D.    For the purposes of Section 20C(i), the amount of Additional Rent which would have been payable by Tenant under Article 8 for each year, as therein provided, ending after such termination of this Lease or such re-entry, shall be deemed to be an amount equal to the amount of such Additional Rent payable by Tenant for the calendar year and Tax Year ending immediately preceding such termination of this Lease or such re-entry increased by 10%, compounded annually, for each year thereafter. Suit or suits for the recovery of such damages, or any installments thereof, may be brought by Landlord from time to time at Landlord's election, and nothing contained herein shall be deemed to require Landlord to postpone suit until the date when the term of this Lease would have expired if it had not been terminated under the provisions of Article 19, or under any provision of law, or had Landlord not re-entered the Premises.

E.    The failure or refusal of Landlord to relet the Premises or any part or parts thereof, or the failure of Landlord to collect the rent therefor under such reletting, shall not release or affect Tenant's liability for damages.

F.    Notwithstanding anything contained in this Lease to the contrary, in no event shall either party be liable to the other for consequential or punitive damages.

22

G.    Nothing contained in this Article 21 shall limit or prejudice the right of Landlord to prove and obtain as liquidated damages in any bankruptcy, insolvency, receivership, reorganization or dissolution proceeding an amount equal to the maximum allowed by a statute or rule of law governing such proceeding and in effect at the time when such damages are to be proved, whether or not such amount shall be greater than, equal to or less than the amount of the damages referred to in any of the preceding sections of this Article 20, subject to subsection F above.

H.    No receipt of monies by Landlord from Tenant after the termination of this Lease, or after the giving of any notice of the termination of this Lease, shall reinstate, continue or extend the Term or affect any notice theretofore given to Tenant, or operate as a waiver of the right of Landlord to enforce the payment of Rent payable by Tenant hereunder or thereafter falling due, or operate as a waiver of the right of Landlord to recover possession of the Premises by proper remedy, except as herein otherwise expressly provided. After the service of notice to terminate this Lease or the commencement of any suit or summary proceedings, or after a final order or judgment for the possession of the Premises, Landlord may demand, receive and collect any monies due or thereafter falling due without in any manner affecting such notice, proceeding, order, suit or judgment, all such moneys collected being deemed payments on account of Tenant's liability hereunder.

I.    Tenant, for and on behalf of itself and all persons claiming through or under Tenant, also waives any and all right of redemption provided by any applicable law or statute now in force or hereafter enacted or otherwise, for re-entry or repossession or to restore the operation of this Lease in case Tenant shall be dispossessed by a judgment or by warrant of any court or judge or in case of re-entry or repossession by Landlord or in case of any expiration or termination of this Lease. The terms "enter", "re-enter", "entry" or "re-entry" as used in this Lease are not restricted to their technical legal meaning.

J.    No failure by either Landlord or Tenant to insist upon the strict performance of any covenant, agreement, term or condition of this Lease or the rules and regulations or to exercise any right or remedy consequent upon a breach thereof, and no acceptance by Landlord of full or partial Rent during the continuance of any such breach, shall constitute a waiver of any such breach or of such covenant, agreement, term or condition or prevent a subsequent act, which would have originally constituted a violation from having all force and effect of any original violation unless otherwise agreed to in writing. No covenant, agreement, term or condition of this Lease to be performed or complied with by Landlord or Tenant and no breach thereof, shall be waived, altered or modified except by a written instrument executed by the other party. No waiver of any breach shall affect or alter this Lease, but each and every covenant, agreement, term and condition of this Lease shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

K.    If an order for relief is entered, or if any stay or other act becomes effective in favor of Tenant or Tenant's interest in this Lease in any proceeding which is commenced by or against Tenant under the present or any future federal bankruptcy code or any other similar present or future applicable federal, state or other statute or law, Landlord shall be entitled to invoke any and all rights and remedies available to it under any such applicable bankruptcy code, statute, law or this Lease, including, without limitation, such rights and remedies as may be necessary to

23

adequately protect Landlord's right, title and interest in and to the Premises or any part thereof and adequately assure the complete and continuous future performance of Tenant's obligations under this Lease. Adequate protection of Landlord's right, title and interest in and to the Premises, and adequate assurance of the complete and continuous future performance of Tenant's obligations under this Lease shall include, without limitation, the following requirements:

   (i) the payment of Landlord's reasonable and actually incurred legal fees in connection with any bankruptcy proceeding;

   (ii) that Tenant comply with all of its obligations under this Lease;

   (iii) that Tenant pay to Landlord, on the first day of each month occurring subsequent to the entry of such order, or the effective date of such stay, a sum equal to the amount by which the Premises diminished in value during the immediately preceding monthly period, but, in no event, an amount which is less than the aggregate Rent payable for such monthly period;

   (iv) that Tenant continue to use the Premises in the manner required by this Lease;

   (v) that Landlord be permitted to review the performance of Tenant's obligations under this Lease;

   (vi) that Tenant pay to Landlord within thirty (30) days after entry of such order or the effective date of such stay, as partial adequate protection against future diminution in value of the Premises and adequate assurance of the complete and continuous future performance of Tenant's obligations under this Lease, a security deposit in an amount equal to twelve months Fixed Rent and Additional Rent then payable hereunder;

   (vii) that Tenant has and will continue to have unencumbered assets after the payment of all secured obligations and administrative expenses to assure Landlord that sufficient funds will be available to fulfill the obligations of Tenant under this Lease; and

   (viii) that if Tenant's trustee, Tenant or Tenant as debtor-in-possession assumes this Lease and proposes to assign the same (pursuant to Title 11 U.S.C. 5365, or as the same may be amended) to any person who shall have made a bona fide offer to accept an assignment of this Lease on terms acceptable to the trustee, then notice of such proposed assignment, setting forth (1) the name and address of such person, (2) all of the terms and conditions of such offer, and (3) the adequate assurance to be provided Landlord to assume such person's future performance under this Lease, including, without limitation, the assurances referred to in Title 11 U.S.C. §365(b)(3), as it may be amended, shall be given to Landlord by the trustee, Tenant or tenant as debtor-in-possession no later than thirty (30) days after receipt by the trustee, Tenant or tenant as debtor-in-possession of such offer, but in any event no later than ten (10) days prior to the date that the trustee, Tenant or Tenant as debtor-in-possession shall make application to a court of competent jurisdiction for authority and approval to enter into such assignment and assumption, and Landlord shall thereupon have the prior right and option, to be exercised by notice to the trustee given at any time prior to the effective date of such proposed assignments, to accept, or to cause Landlord's designee to accept, an assignment of this Lease upon the same terms and conditions and for the same consideration, if any, as the bona fide offer made by such person less any brokerage

24

commissions which may be payable out of consideration to be paid by such person for the assignment of this Lease.

L.     Tenant hereby waives trial by jury in any action, proceeding or counterclaim brought by Landlord on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, and/or any claim of injury or damage, or for the enforcement of any remedy under any statute, emergency or otherwise.  If Landlord commences any summary proceeding for nonpayment of rent, Tenant will not interpose any non-mandatory counterclaim of whatever nature or description in any such proceeding however Tenant shall not be prevented from commencing any action separately. .

## 21.     FEES AND EXPENSES

In any action or proceeding brought by either party to enforce any of the covenants and provisions of this Lease to be performed by the other party to which the party who brought the action or proceeding secures a final unappealable judgment, the other party shall be entitled to recover its reasonable costs, including reasonable attorneys' fees, , such amounts to be payable within thirty (30) days after delivery of an invoice for such amount and deemed Additional Rent hereunder.

## 22.     VAULT, VAULT SPACE AREA

Notwithstanding anything contained in this Lease or indicated on any of Tenant's Plans, sketches, blueprints or other plan or anything contained elsewhere in this Lease to the contrary, no vault(s), vault space or area ("Vault"), outside of the property line of the Building, is leased hereunder, regardless of whether or not such Vault is enclosed or covered.  Such Vault and all such areas not within the property line of the Building, which Tenant may be permitted to use and/or occupy, is to be used and/or occupied under a revocable license, and if any such license be revoked, or if the amount of such space or area be diminished or required by any federal, state or municipal authority or public utility, Landlord shall not be subject to any liability, nor shall Tenant be entitled to any compensation or diminution or abatement of rent, nor shall such revocation, diminution or requisition be deemed constructive or actual eviction. Any tax, fee or charge of municipal authorities for such Vault or area shall be paid by Tenant.  Landlord makes no representations as to the location of the property line of the Building.  Tenant shall indemnify and save Landlord harmless from any and all damages arising from or in connection with Tenant's or any of Tenant's agents', employees' or contractors' use of any Vault or any violations by Tenant of this Section 22.  Tenant's obligations under this Section 22 shall survive the expiration or earlier termination of this Lease.

## 23.     ACCESS TO PREMISES

Tenant shall permit Landlord, Landlord's agents and public utilities servicing the Building to erect, construct, use and maintain, concealed ducts, pipes, conduits, supports, beams and wiring, in and through the Premises as Landlord may deem reasonably necessary or desirable for the Premises or for any portion of the Building.  Upon prior written notice of at least 48 hours, and subject to reasonable coordination with Tenant, Landlord or Landlord's agents shall have the right to enter the Premises at all reasonable times (provided that Landlord shall have the right to

25

immediate access to the Premises without notice in case of emergency which affects the health, safety or welfare of persons or property) (i) to examine the same, (ii) to show them to prospective purchasers or mortgagees, or during the last six (6) months of the Term to lessees of the Building or space therein, (iii) subject to the terms of this Lease and subject to reasonable coordination with Tenant, to make such repairs, as Landlord may deem reasonably necessary to the Premises or to any other portions of the Building as may be required by Landlord to make under the terms of this Lease, (iv) to make such repairs or perform such work which Landlord may elect to perform following Tenant's failure, after notice and the expiration of any applicable grace period, to make repairs or perform any work which Tenant is obligated to perform under this Lease, or (v) to make such repairs, alterations, improvements or additions as may be required for the purpose of complying with all Legal Requirements. In connection with the work to be performed pursuant to clauses (i), (ii), (iii), (iv) or (v) above, Landlord shall be allowed to take all material and equipment into and upon the Premises that may be required therefor without the same constituting an eviction or constructive eviction of Tenant in whole or in part and so long as Tenant is not prevented from conducting its ordinary business within the Premises during such repairs, the Rent shall in no wise abate while said repairs, alterations, improvements, or additions are being made, by reason of loss or interruption of business of Tenant, or otherwise. If Tenant shall not be personally present to open and permit an entry into the Premises, at any time, when for a reason of an emergency an entry therein shall be necessary, Landlord or Landlord's agents may enter the same by force, without rendering Landlord or such agents liable therefor if during such entry Landlord or Landlord's agents shall accord reasonable care to Tenant's Property, and without in any manner affecting the obligations and covenants of this Lease. Nothing contained in this Article 23, however, shall be deemed or constructed to impose upon Landlord any obligation, responsibility or liability whatsoever for the care, supervision or repair of the Building or any part thereof, other than as provided in this Lease.

## 24.    SURVIVAL OF TENANT'S OBLIGATIONS AND DAMAGES

No expiration or termination of the Lease Term pursuant to this Lease, by operation of law or otherwise (except as expressly provided herein), and no repossession of the Premises or any part thereof pursuant to this Lease or otherwise, shall relieve Tenant of Tenant's obligations or liabilities hereunder, all of which shall survive such expiration, termination or repossession for a period of one (1) year, or as otherwise expressly provided for in this Lease.

## 25.    INJUNCTION

Landlord and Tenant, in addition to all other rights, powers and remedies and notwithstanding the concurrent pendency of summary or other dispossess proceedings, at such party's option, shall have the right at all times during the Lease Term to seek to restrain by injunction any violation or attempted violation by the other party of any of the terms, covenants or conditions of this Lease, and to seek to enforce by injunction any of such terms, covenants or conditions.

## 26.    ESTOPPEL CERTIFICATES

Landlord or Tenant, within ten (10) days after request of the other, shall execute,

acknowledge and deliver to the other, promptly upon request, a certificate certifying: (a) that this Lease is unmodified and in full force and effect (or, if there have been modifications, that the Lease is in full force and effect, as modified, and identifying the modifications); (b) the dates to which Rent has been paid; (c) whether or not there is any existing default by Landlord or Tenant with respect to which a notice of default has been delivered, and if there is any such default, specifying the nature and extent thereof; (d) whether or not there are any setoffs, defenses or counterclaims against the enforcement of any term, covenant or condition of this Lease, and (e) any other factual items requested by the requesting party. Any such certificate may be relied upon by any prospective purchaser or mortgagee of the Premises or any part thereof. If Tenant shall have failed to deliver the required estoppel certificate within the time period proscribed herein, without limiting Landlord's rights or remedies hereunder, such failure shall be deemed an admission by Tenant that (1) that this Lease is unmodified and in full force and effect; (2) that rent has been paid through the date for which the estoppel was requested; (3) that there is no existing default by Landlord or Tenant with respect to which a notice of default has been delivered; and (4) that Tenant has no right of setoffs, defenses or counterclaims against the enforcement of any term, covenant or condition of this Lease. Any such certificate may be relied upon by any prospective purchaser or mortgagee of the Premises or any part thereof.

### 27.    REMEDIES CUMULATIVE

All of the rights, powers and remedies of Landlord and Tenant provided for in this Lease or now or hereafter existing at applicable law or in equity, or by statute or otherwise, shall be deemed to be separate, distinct, cumulative and concurrent. No one or more of such rights, powers or remedies, nor any mention of reference to any one or more of them in this Lease, shall be deemed to be in the exclusion of, or a waiver of, any other rights, powers or remedies provided for in this Lease, or now or hereafter existing at applicable law or in equity, or by statute or otherwise. The exercise or enforcement by Landlord or Tenant of any one or more of such rights, powers or remedies shall not preclude the simultaneous or later exercise or enforcement by Landlord or Tenant, as the case may be, of any or all of such other rights, powers or remedies. In no event, however, shall either party be entitled to seek or receive consequential or punitive damages.

### 28.    ASSIGNMENT, SUBLETTING AND MORTGAGES

A.    Tenant expressly covenants that, except as otherwise expressly provided herein, Tenant shall not voluntarily or involuntarily assign, encumber, mortgage or otherwise transfer this Lease, or sublet the Premises or any part thereof, or suffer or permit the Premises or any part thereof to be used or occupied by others, by operation of law or otherwise, without the prior written consent at the discretion of Landlord in each instance (unless otherwise expressly provided herein). Absent such consent, any act or instrument purporting to do any of the foregoing shall be null and void.

B.    Intentionally Omitted.

C.    .Intentionally Omitted.

D.    If this Lease is assigned, whether or not in violation of the terms of this Article 28, Landlord may collect Rent from the assignee after default by Tenant hereunder beyond the

27

expiration of applicable notice, grace and/or cure periods. If the Premises or any part thereof are sublet or occupied by anybody other than Tenant, Landlord, after any default by Tenant beyond the expiration of applicable notice, grace and/or cure periods, may collect rent from the subtenant or occupant, and apply the net amount collected to the Rent due hereunder. Such collection of rent by Landlord shall not be deemed a waiver of the provisions hereof, the acceptance of the assignee, subtenant or occupant as a tenant, or a release of Tenant from the further observance and performance by Tenant of the terms, covenants and conditions of this Lease.

E.       The consent by Landlord to an assignment, encumbrance, transfer or subletting shall not in any way be deemed consent to any further assignment, encumbrance, transfer or subletting. In no event shall any permitted subtenant assign or encumber its sublease or further sublet all or any portion of its sublet space, or otherwise suffer or permit the sublet space or any part thereof to be used or occupied by others, without the prior written consent of Landlord in each instance, which shall not be unreasonably withheld, conditioned or delayed as provided in this Article 28, and each permitted sublease shall so provide in its terms. If Landlord consents to any assignment or sublease and the terms set forth in the Sublease Notice are changed beyond a de minimus extent, Landlord's consent shall be deemed null and void and Tenant shall again obtain Landlord's consent to the revised terms in accordance herewith.

F.       Upon receiving Landlord's written consent, a duly executed copy of the sublease or assignment shall be delivered to Landlord within thirty (30) days after execution thereof. Any such sublease shall provide that the subtenant shall take subject to all applicable terms, covenants and conditions of this Lease to be observed or performed by Tenant hereunder. Any such assignment shall contain an assumption by the assignee of all of the terms, covenants and conditions of this Lease to be observed or performed by Tenant.

G.       The joint and several liability of Tenant and any immediate or remote successor in interest to Tenant, any Guarantors of Tenant's obligations hereunder, and the due performance of the obligations of this Lease on Tenant's part to be performed or observed, shall not be discharged, released, or impaired in any respect by any agreement or stipulation made by Landlord extending the time of, or modifying any of the obligations of, this Lease. Further, the joint and several liability of Tenant and any immediate or remote successor in interest to Tenant, any Guarantors of Tenant's obligations hereunder, and the due performance of the obligations of this Lease on Tenant's part to be performed or observed, shall not be discharged, released, or impaired in any respect by any assignment, subletting or other transfer.

H.       The transfer of a majority of the issued and outstanding capital stock of any corporate tenant or subtenant of this Lease or of a majority of the total interest in any partnership or limited liability company tenant or subtenant, however accomplished, and whether in a single transaction or in a series of related or unrelated transactions, shall be deemed an assignment of this Lease or of such sublease. The transfer of outstanding capital stock of any corporate tenant or subtenant, for purposes of this Article 28, shall not include a sale of such stock by persons effected through any "over the counter" market or recognized stock exchange.

I.       Anything hereinabove contained to the contrary notwithstanding, Landlord's consent shall not be required for an assignment of this Lease, or sublease of all or part of the Premises for the uses permitted hereunder, to a Related Entity, provided that (i) Landlord is given

28

10 days' prior notice thereof and reasonably satisfactory proof that the requirements of this Lease have been met and Tenant agrees to remain primarily liable, jointly and severally, with any transferee or assignee, for the obligations of Tenant under this Lease, (ii) any such transaction complies with the other provisions of this Article 28.

J.      For purposes of this Article:

(i) a "Related Entity" shall mean (x) a wholly-owned subsidiary of Tenant or any corporation or entity which controls or is controlled by Tenant or is under common control with Tenant or (y) any entity (i) to which substantially all the assets of Tenant are transferred or (ii) into which Tenant may be merged or consolidated, provided that in either such case the net worth (exclusive of good will) of such transferee or of the resulting or surviving corporation or other business entity, as the case may be, as certified by the certified public accountants of such transferee or the resulting or surviving business entity in accordance with generally accepted accounting principles, consistently applied, is not less than Tenant's net worth (exclusive of good will), as so certified, as of (a) the Commencement Date or (b) the day immediately prior to such transaction, whichever is greater, provided also that any such transaction complies with the other provisions of this Article 28; and

K.      (ii) the term "control" shall mean, in the case of a corporation or other entity, ownership or voting control, directly or indirectly, of at least fifty (50%) percent of all of the general or other partnership (or similar) interests therein.

## 29.    SUBORDINATION AND ATTORNMENT

A.      This Lease, and all rights of Tenant hereunder, are and shall be subject and subordinate in all respects to all ground leases, overriding leases and underlying leases and/or grants or term of the Premises in whole or in part now or hereafter existing and to all mortgages and building loan agreements and any condominium declaration and by-laws which may hereafter affect the Real Property and/or any of such leases, whether or not such mortgages and declaration shall also cover other lands and/or buildings, to each and every advance made or hereafter to be made under such mortgages, and to all renewals, modifications, replacements and extensions of such leases and such mortgages and spreaders, consolidations and correlations of such mortgages and any and all amendments to any such declaration. The provisions of this paragraph shall be self-operative and no further instrument of subordination shall be required.

B.      In confirmation of such subordination, Tenant shall promptly execute and deliver, at its own cost and expense, any instrument, in recordable form if requested by Landlord, that Landlord, the lessor of any such lease, including, but not limited to the holder of any such mortgage or any of their respective successors in interest may request to evidence such subordination. The leases to which this Lease is, at the time referred to, subject and subordinate pursuant to this paragraph, are sometimes-hereinafter called "superior leases" or "Superior Leases" and the mortgages to which this Lease is, at the time referred to, subject and subordinate are sometimes hereinafter called "superior mortgages" or "Superior Mortgages" and the lessor or its successor in interest at the time referred to in the Superior Leases is sometimes hereafter called a "lessor" or "Superior Lessor" and the holder of a Superior Mortgage is hereinafter referred to as a "Superior Mortgagee". Landlord represents that as of the date hereof, there are no Superior Leases, Superior

29

Mortgages, building loan agreements, condominium declarations or other encumbrances recorded against the Building, which is owned in fee by Landlord.

C.    If any Superior Lessor or Superior Mortgagee or any successor or assignee thereof or any purchaser at a foreclosure sale or by deed in lieu of foreclosure (collectively, "Future Mortgagee") succeeds to the rights of Landlord under this Lease, then at the request of same, Tenant shall attorn to such Future Mortgagee as Tenant's landlord under this Lease under all of the terms and conditions of this Lease. Tenant shall, within fifteen (15) days following a request by such Future Mortgagee, sign, acknowledge and deliver any reasonable instrument that such Future Mortgagee requests to evidence such attornment.

D.    A mortgagee may elect that this Lease shall have priority over its mortgage and upon notification by the mortgagee to Tenant, this Lease shall be deemed to have priority over such mortgage.

E.    Notwithstanding anything contained herein to the contrary, Tenant's agreement to subordinate this Lease and attorn to any Superior Leases or Superior Mortgages shall be conditioned on Landlord obtaining a so-called "non-disturbance agreement" in favor of Tenant, (1) in the case of a Superior Mortgage, from the holder of any such Superior Mortgage on the form promulgated by such Superior Mortgage holder and (ii) in the case of a Superior Lease, the lessor of such Superior Lease in form and substance reasonably satisfactory to Tenant such lessor. The failure of Tenant to execute and deliver a "non-disturbance agreement" on the form promulgated by a Superior Mortgage holder within fifteen (15) days of the request for such execution shall be deemed Landlord's compliance with the terms hereof.

### 30.    CONVEYANCE BY LANDLORD; LIMITATION ON LIABILITY

A.    If the original or any successor Landlord shall convey or otherwise dispose of the Real Property, such transferring Landlord shall thereupon be released from all obligations and liabilities of Landlord under this Lease (except those accruing prior to such conveyance or other disposition), and such obligations and liabilities shall be binding solely on the then Landlord under this Lease.

B.    Notwithstanding anything contained in this Lease, at applicable law or in equity to the contrary, it is expressly understood, acknowledged and agreed by Tenant that there shall at no time be or be construed as being any personal liability by or on the part of Landlord under or in respect of this Lease or in any wise related hereto or the Premises; it being further understood, acknowledged and agreed that Tenant is accepting this Lease and the estate created hereby upon and subject to the understanding that it shall not enforce or seek to enforce any claim or judgment or any other matter, for money or otherwise, personally against any officer, director, stockholder, partner, principal (disclosed or undisclosed), representative or agent of Landlord, but shall look solely to the equity of Landlord in the Real Property, and the proceeds of casualty insurance, condemnation awards and the net proceeds of sale of the Real Property (including, without limitation, the rents, issues and profits therefrom), and not to any other assets of Landlord, for the satisfaction of any and all remedies or claims of Tenant in the event of any breach by Landlord of any of the terms, covenants or agreements to be performed by Landlord under this Lease or otherwise in connection with this Lease; such exculpation of any officer, director, stockholder,

30

partner, principal (disclosed or undisclosed), representative or agent of Landlord from personal liability as set forth in this Section 30 to be absolute, unconditional and without exception of any kind. Nothing herein shall reduce Landlord or Tenant's rights under Article 25.

## 31.    NO MERGER OF TITLE

There shall be no merger of the leasehold estate created by this Lease with the fee estate in the Premises by reason of the fact that the same person may own or hold (a) the leasehold estate created by this Lease or any interest therein, and (b) the fee estate in the Premises or any interest in such fee estate. No such merger shall occur unless and until all persons having any interest in the leasehold estate created by this Lease, and in the fee estate in the Premises, including, without limitation, the holder of any mortgage encumbering the Premises, shall consent and join in a written instrument effecting such merger and shall duly record the same.

## 32.    ACCEPTANCE OF SURRENDER

No modification, termination or surrender of this Lease or surrender of the Premises (except to the extent such surrender is a result of the expiration or other termination of this Lease in accordance with its terms) or any part thereof or of any interest therein by Tenant shall be valid or effective unless agreed to and accepted in writing by Landlord, and no act by any representative or agent of Landlord, other than such a written agreement and acceptance, shall constitute an acceptance thereof.

## 33.    END OF LEASE TERM

A.    Upon the expiration or termination of the Lease Term, Tenant shall quit, surrender and deliver to Landlord the Premises with the improvements thereon, and otherwise in good order and condition, ordinary wear and tear and damage by casualty and failure of Landlord to make repairs required to be made by it hereunder excepted; and Tenant shall remove therefrom all Tenant's Equipment, inventory, fixtures, tangible items and other moveable personal property (collectively, "Tenant's Property").

B.    If the Premises are not surrendered at the end of the Lease Term, Tenant shall be obligated to pay monthly rent at a rate which (i) for the first thirty (30) days of such holdover is one hundred fifty percent (150%) of the monthly Fixed Rent and (ii) for any periods in excess of the first thirty (30) days of such holdover is two hundred percent (200%) of the monthly Fixed Rent until Tenant actually surrenders the Premises pursuant to the terms of this Section 33. In all events, Tenant shall remain liable for one hundred percent (100%) of the Additional Rent then payable, until Tenant actually surrenders the Premises pursuant to the terms of this Section 33.

C.    Should Landlord incur any expense in removing Tenant, any subtenant, or any other person holding by, through, or under Tenant or any subtenant, who has failed to so surrender the Premises or any part thereof, Tenant shall reimburse Landlord for the reasonable cost and expense (including, without limitation, attorneys' fees, disbursements and court' costs) of removing such subtenant or such person.

66938335v.5

## 34.    OPTION TO EXTEND LEASE TERM

A.    Tenant is hereby granted an option to extend the term of this Lease for one (1) additional successive period of five (5) years ("Extended Term"); provided that (A) Tenant has not been, and is not in default hereunder beyond any applicable notice and cure periods at (1) the time that Tenant exercises its right to renew the Lease and (2) of the commencement of the Extended Term and (B) Tenant shall serve written notice of Tenant's intention to exercise the Extended Term upon Landlord not less than nine (9) months nor more than eighteen (18) months prior to the expiration of the Initial Term, time being of the essence as to Tenant's delivery of the notice specified herein.  In the event that Tenant fails to timely deliver such notice to Landlord, then all of Tenant's rights in connection with the unexercised Extended Term shall be null and void and shall have no further force or effect.

B.    If the Lease is renewed for the then applicable Extended Term, the term of this Lease shall be automatically extended for the applicable Extended Term then exercised without necessity for the execution of any instrument to affect the same. In such event the phrases "the Lease Term", "the Term of this Lease" and "the Term hereof" as used in this Lease shall include such Extended Term.

C.    All of the other terms, covenants and conditions of the Lease, other than the payment of Fixed Rent (which shall be in the amounts set forth below), shall remain in full force and effect during the Extended Term, except that this Lease shall expire upon the expiration of the then applicable Extended Term. Tenant shall remain liable for the payment of all of the Tax Rent, as well as all other items of Additional Rent throughout the applicable Extended Term.

D. If Tenant shall have elected to extend the term of this Lease as provided in subparagraph A above, then the Fixed Rent for the Extended Term shall increase at a rate of two and one-half percent (2.5%) during each year of the Extended Term.  Throughout the Extended Term, Fixed Rent shall be payable in equal consecutive monthly installments, on the first day of each and every month, and otherwise in the manner as set forth elsewhere herein.

## 35.    BROKERAGE

Landlord and Tenant each represents and warrants to the other that such party has not dealt with any broker or finder in connection with the Premises or this Lease other than Newmark & Company Real Estate Inc. and Retail Zone LLC (collectively, the "Broker"), whose commission shall be paid by Landlord pursuant to a separate written agreement. Landlord and Tenant each agree to indemnify and hold the other harmless from and against any and all commission, liability, claim, loss, damage or expense, including reasonable attorneys' fees, arising from any claims for brokerage or any other fee or commission by any person, other than the Broker with whom such party has dealt.

## 36.    HAZARDOUS MATERIALS

A.    Tenant shall not use or suffer the Premises or the Building or Real Property to be used in any manner so as to create an environmental violation or hazard, nor shall it cause or suffer to be caused any chemical contamination or discharge of a substance of any nature which is

32

noxious, offensive or harmful or which under any law, rule or regulation of any governmental authority having jurisdiction constitutes a hazardous substance or hazardous waste.

B.     Tenant shall also immediately notify Landlord in writing of any environmental concerns of which Tenant is or becomes aware and which are raised by any private party or government agency with regard to Tenant's business or the Premises. Tenant shall also notify Landlord immediately of any hazardous waste spills at the Premises and of any other hazardous waste or substances of which Tenant becomes aware.

C.     Not in limitation of the generality of the foregoing, but as additional covenants, Tenant specifically agrees that (i) it shall not generate, manufacture, refine, transport, treat, store, handle, dispose or otherwise deal with any Hazardous Materials as now or hereafter defined by applicable Legal Requirements, other than customary office and cleaning supplies, and then only in accordance with all Legal Requirements; and (ii) it shall defend, indemnify and hold Landlord harmless against any liability, loss, cost or expense, including reasonable attorneys' fees and costs (whether or not legal action has been instituted) incurred by reason of the existence of any Hazardous Materials introduced to or brought upon the Premises or the Building, as the case may be, by it or persons under its reasonable control, or any failure by it to comply with any environmental Legal Requirement now or hereafter in effect relating to any Hazardous Materials introduced by it to the Premises or the Building or the Real Property, as the case may be.

D.     As used herein, the term "Hazardous Materials" means and includes any pollutant, contaminant, waste, material, compound or substance or substance (whether in the form of liquids, solids or gases, and whether or not airborne) regulated by any federal, state or local Law, regulation, guidance or policy for the protection of human health and safety, and the environment (including natural resources), including, but not limited to, pesticides, petroleum, petroleum products or constituents, asbestos, polychlorinated biphenyl, radioactive material, and urea formaldehyde and mold.

E.     Tenant covenants and agrees that at any and all times during the Term it shall be responsible for compliance with any applicable federal, state, county, local, or municipal law (including without limitation Local Law 76, as same now exists or may hereafter be amended, if the Building is located in New York City), statute, ordinance, code, regulation or administrative requirements pertaining to Hazardous Materials introduced to the Premises by Tenant, its agents, employees, contractors, licensees and invitees. Tenant shall, at its sole cost and expense, undertake any and all steps which may be required for compliance as aforesaid. In addition, Tenant shall be solely responsible for restoring and repairing any damage to the Premises caused by or resulting from such compliance.

F.     Notwithstanding anything herein to the contrary, Tenant shall file no documents or take any other action under this Article without Landlord's prior written approval thereof, not to be unreasonably withheld, conditioned or delayed or charged for in accordance with the provisions of this Lease and Landlord, to the extent Tenant fails to do so as and when required, shall also have the right to file such documents or take such action instead or on behalf of Tenant (but still at Tenant's sole cost and expense), and Tenant shall cooperate with Landlord in so doing. Landlord and Tenant shall also (i) furnish the other with copies of any documents filed by it pursuant to any environmental law; (ii) permit the other to be present at any inspection, on or off

33

site, and at any meetings of government environmental officials; and (iii) provide the other with an inventory of materials and substances dealt with by it at the Premises or the Building or Real Property, as the case may be, as well as any additional information available to it for government filings or determinations as to whether there has been compliance with an environmental law.

G.    Landlord shall also have the right to enter the Premises, upon 48 hours advance prior notice if reasonable under the circumstances, to conduct tests to discover the facts of any alleged or potential environmental problem, provided the conducting of such tests is coordinated with Tenant so as not to unreasonably interfere with Tenant's business.

H.    In the event Tenant fails to comply as aforesaid with the clean-up, removal, and/or encapsulation of Hazardous Materials when so required within the period of time permitted or promulgated, then in such event Landlord may, but shall not be obligated to, undertake said work. Should Landlord undertake said work required by Tenant as aforesaid, then in such event, Landlord shall render a statement to Tenant for the reasonable and actual cost and expense of undertaking said work plus a charge of ten (10%) percent for administrative costs and expenses, which statement shall be paid by Tenant as Additional Rent within thirty (30) days of receipt thereof.

I.    To Landlord's knowledge (without investigation), no Hazardous Materials have been released, discharged or disposed of on, under or about the Premises or the Real Property by any entity, firm or person, or from any source whatsoever.  If any Hazardous Materials are deposited, released, stored, disposed, discovered or present in or on the Premises or the Real Property (not caused by Tenant), Landlord, at Landlord's expense, shall in a manner that complies with all applicable Legal Requirements remove, transport and dispose of such substances and perform all remediation and cleanup necessary or advisable to remediate any damage to persons, property or the environment as a result of the presence of such hazardous substances.  Landlord shall use commercially reasonable efforts to minimize direct and indirect impact on Tenant during all activities related to remediation.  Landlord shall protect, indemnify and hold harmless Tenant and its agents, officers, directors, contractors, employees, parents, subsidiaries, successors and assigns from and against any and all loss, damage, cost, expense or liability (including reasonable attorneys' fees) ("Claims") directly or indirectly related to: (i) a violation of Legal Requirements by Landlord or Landlord's agents, contractors or employees use, manufacture, storage, release or disposal of a Hazardous Materials on the Real Property or the Premises; or (ii) a breach by Landlord of any representation, warranty, covenant or agreement contained in this Article.  This indemnity shall survive the termination of this Lease.

J.    The provisions of this Article shall survive the expiration or earlier termination of this Lease, and the Tenant shall require any permitted assignee or sub-lessee of the Premises to agree expressly in writing to comply with all the provisions of this paragraph.

## 37.    CHEMICAL WASTE

Tenant agrees that Tenant shall not pour or otherwise dispose of any chemical, chemical waste, chemical by-products, or other such material, through the drainage (plumbing) system of the Premises.  This representation by Tenant is a material inducement to Landlord to enter into this Lease, and without such inducement, Tenant acknowledges that Landlord would not have entered

66938335v.5

into this Lease. Accordingly, Tenant's breach of this Section 37 shall, subject to applicable notice and cure periods, be deemed a material default under this Lease, entitling Landlord to exercise any and all of its rights for Tenant's default. Nothing contained herein shall prohibit Tenant from using and storing typical cleaning products in normal amounts and in compliance with all applicable environmental laws.

## 38.    DEFINITIONS

As used in this Lease, the following terms have the following respective meanings:

"Additional Rent" as defined in Section 2A(ii).

"Alterations" - shall mean the making or performance of any alterations, installations, improvements, additions or other physical changes, including, but not limited to, a water-cooler, an air-conditioning unit or cooling system or part thereof or other apparatus of like or other nature, in or about the Premises.

"Authority" -- shall mean all present and future laws, rules, regulations, orders, ordinances, judgments, and requirements of the United States of America, the State of New York, the town, village, municipality and/or county in which the Premises are located, or any present or future subdivision or instrumentality thereof, any court, agency, department, commission, board, or bureau, and any fire insurance rating body applicable to Tenant's occupancy of the Premises, Tenant's Work, Tenant's Equipment or the Premises.

"Broker"- as defined in Section 35.

"Building" - as defined in Section 1.

"Premises" - as defined in Section 1.

"Event(s) of Default" - as defined in Section 19.

"Extended Term" - as defined in Section 34.

"Fixed Rent" - as defined in Section 2A.

"Hazardous Material" - as defined in Section 36D.

"Impositions" - as defined in Section 8A(i).

"Initial Term"- as defined in Section 1.

"Intended Use" - as defined in Section 4A.

"Interest Rate" - as defined in Section 2A(ii).

"Landlord's Statement" - as defined in Section 8A(ii).

"Lease" - this Lease, as at the time amended, modified or supplemented.

35

"Lease Term" - as defined in Section 1, as the same may be extended or renewed.

"Lease Year" - a period of twelve (12) months, except that the first Lease Year shall commence on the Commencement Date and shall end twelve (12) months following the Rent Commencement Date, provided, if the Rent Commencement Date is not the first day of a month, the first Lease Year shall end on the last day of the month in which the first anniversary of the Rent Commencement Date occurs. Each Lease Year after the first Lease Year shall commence immediately subsequent to the prior Lease Year. The Lease Year commencing on the Commencement Date is referred to as the first Lease Year and each subsequent Lease Year shall be numbered consequently and referred to accordingly.

"Legal Requirements" - all laws, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions, rules, regulations, permits, licenses, authorizations, directions and requirements of all governments, departments, commissions, boards, courts, authorities, agencies, officials and officers, foreseen or unforeseen, ordinary or extraordinary, which now or at any time hereafter may be applicable to the Premises or any part thereof, or the facilities or equipment therein, or any use or condition of the Premises or any part thereof.

"Person" - an individual, a corporation, an association, a partnership, a joint venture, an organization, or other business entity, or a governmental or political unit or agency.

"Premises" - as defined in Section 1.

"Prohibited Uses"- as defined in Section 4A.

"Real Property" - shall mean the tax lot of which the Building is a part, and Building.

"Rent" - as defined in Section 2C.

"Rent Commencement Date" - as defined in Section 1.

"Restoration" - all restorations, replacements, rebuildings, alterations, additions, temporary repairs and property protection to be performed in connection with a Taking of the Premises or the damage to or destruction of the Premises.

"Signs" - as defined in Section 40B.

"Systems" - as defined in Section 12.

"Taking" - as defined in Section 16A.

"Tax Year" – as defined in Section 8A(iv).

"Taxes" - as defined in Section 8A(i).

"Tenant's Equipment" - all moveable fixtures, machinery, apparatus, furniture, furnishings and other equipment including, without limitation, Tenant's trade fixtures, and all moveable temporary or auxiliary structures installed by or at the request of Tenant in or about the Premises or any part thereof.

36

"Tenant's Property" - as defined in Section 33A

"Tenant's Plans"- as defined in Section 7C(ii).

"Tenant's Proportionate Share" - shall mean 100%.

"Tenant's Repair Notice" - as defined in Section 15E.

"Term" - as defined in Section 1.

"Unavoidable Delays" - delays due to strikes, acts of God, governmental restrictions, epidemics, pandemics, enemy action, riot, civil commotion, fire, unavoidable casualty or other causes beyond the control of Tenant which would reasonably preclude Tenant from opening the Premises for business. Lack of funds shall not be deemed a cause beyond the control of Tenant. In event shall Unavoidable Delays excuse or delay the payment of Rent.

"Vault" - as defined in Section 22.

## 39.    NOTICES

All notices, demands, elections and other communications desired or required to be delivered or given under this Lease shall be in writing, and shall be deemed to have been delivered and given upon receipt or refusal after the same have been mailed by first class registered or certified mail, postage prepaid, or by overnight courier such as FedEx, enclosed in a securely sealed envelope addressed to the party to which the same is to be delivered or given, in all cases, at such party's address as set forth in this Section 39 of this Lease or at such other address as said party shall have designated in writing in accordance with this Section 39 (upon not less than ten (10) days' written notice to the other). All notices served upon Landlord shall be sent to BNN Fulton Flushing Owner LLC c/o Braha Industries 10 West 33 St., Suite 220, New York, NY 10001. All notices served upon Tenant shall be sent to Tenant at the following address: 147 8th Avenue New York, NY 10011. A copy of any notice served upon Tenant shall be sent to Samuel Calvo, Esq., Calvo Law Group, 29 West 36th Street, Suite 400, New York, NY 10018. Notices required or permitted to be given hereunder may be given by a party's attorney.

## 40.    SIGNS

A.    Tenant shall have the right to install a storefront sign at the Premises, subject to Landlord's prior written approval, not to be unreasonably withheld, provided the same complies with Article 7 hereof. Such storefront shall, during the Term, of this Lease be subject to the terms of this Lease, and all applicable Legal Requirements. Tenant shall have the right to alter, change or modify the said storefront subject to the terms of this Lease (including, without limitation, the prior approval of Landlord), and all applicable Legal Requirements.

B.    Tenant shall at all times during the Lease Term, at its sole expense, maintain, or cause to be maintained the store front sign or any other sign permitted pursuant to the terms of this Lease, (collectively, "Signs") in good order, repair and condition. Tenant shall obtain all necessary permits for any Signs at its sole cost and expense. All Signs shall be professionally designed, prepared and installed. Tenant acknowledges that in all cases, the preservation of the physical

37

appearance of the Building facade and surroundings is of material importance of Landlord. No signs, lighting or equipment shall be permitted which would interfere with Building entrances. Tenant shall not place in the windows or in any display or other area visible to the public view from the outside of the Premises any hand-made paper or flashing, blinking, neon or animated sign or one which otherwise has variations in the intensity of illumination.

C.     If Landlord shall deem it reasonably necessary to remove any sign in order to paint or to make repairs, alterations or improvements in or upon the Premises, Landlord shall have the right to do so, provided that Tenant is given ten (10) days' prior notice from Landlord and Landlord coordinates such removal with Tenant; provided, however, that in any such event Landlord agrees to use commercially reasonable efforts to expedite the performance of such work, in order to minimize the time that Tenant's signs are removed from the sign bands of the Premises and that Landlord shall at its cost install a temporary sign at an alternative location, if any, reasonably requested by Tenant during such work.  On the expiration or sooner termination of the Term, Tenant shall (i) promptly remove all signs installed or displayed by Tenant, and (ii) promptly repair in a good and workmanlike manner in conformity with Legal Requirements and all applicable provisions of this Lease, all damage to the Building caused by such removal.

### 41.     ADJACENT EXCAVATION-SHORING

If an excavation shall be made upon land adjacent to the Premises or any part thereof, or shall be authorized to be made, Tenant shall afford to the person causing or authorized to cause such excavation license to enter upon the Premises upon at least 48 hours advance notice at reasonable times for the purposes of doing such work as such person shall deem necessary or advisable to preserve the wall or the Building from injury or damage and to support the same by proper foundations, without any claim for damages, set-off, rent abatement or indemnity against Landlord, provided such person shall be responsible for repairing any damage caused by such entry and uses reasonable efforts to minimize interference with Tenant's business.

### 42.     MISCELLANEOUS

A.     All rights, powers and remedies provided herein may be exercised only to the extent that the exercise thereof does not violate any applicable law, and are intended to be limited to the extent necessary so that they will not render this Lease invalid, unenforceable or, subject to subsection I below, not entitled to be recorded under any applicable law. If any term, covenant or condition of this Lease shall be held to be invalid, illegal or unenforceable, the validity of the other terms, covenants and conditions of this Lease shall in no way be affected thereby.

B.     Landlord hereby represents that (i) it has the due authority to enter into this Lease; (ii) all conditions precedent to the execution of this Lease by Landlord have been satisfied; (iii) it is in good standing and is qualified to do business in the State of New York; and (iv) it owns in fee the Premises.

C.     Tenant hereby represents that (i) it has the authority to enter into this Lease, (ii) it is duly organized under the laws of the State of New York, (iii) that all conditions precedent to the execution of this Lease by Tenant have been satisfied and (iv) is qualified to do business in New York.

66938335v.5

D.     This Lease shall be governed by the laws of the State of New York. Any action, commenced in connection with this Lease shall be brought in the State or Federal Court of the State of New York.

E.     Neither Landlord nor Tenant shall at any time prior to or during the Term of this Lease, either directly or indirectly, use any contractors, laborers or materials the use of which would create any conflicts with other contractors and/or laborers employed by Tenant or Landlord in the construction, maintenance or operation of the Premises or the Building. Landlord represents that the Tenant shall not be required to use union labor in connection with its work. All work performed by or on behalf of Tenant or Landlord shall be done in a workmanlike manner.

F.     This Lease supersedes all prior agreements between Landlord and Tenant with respect to any of the space included within the Premises.

G.     This Lease is offered to Tenant for signature with the understanding that it shall not be binding upon Landlord or Tenant unless and until the Lease is executed by Landlord and Tenant and delivered to Tenant or its agent, attorney, or other authorized representative.

H.     This Lease contains the entire agreement between the parties hereto with respect to the transactions contemplated herein, and no representation, promise, inducement or statement of intention relating to the transactions contemplated by this Lease has been made by any party which is not set forth in this Lease.

I.     Tenant shall not record this Lease or any memorandum hereof without the prior written consent of Landlord. Any attempted recording shall be deemed null and void.

J.     The headings in this Lease are for purposes of reference only and shall not limit or define the meaning hereof. This Lease may be executed in any number of counterparts, each of which is an original, but all of which shall constitute one instrument.

K.     Landlord and Tenant shall be excused for the period of any delay in the performance of any obligations hereunder when prevented from doing so by an Unavoidable Delay; provided that in no event shall such Unavoidable Delay affect Tenant's obligation to pay Fixed Rent and Additional Rent hereunder.

L.     This Lease may be changed or modified only by an instrument in writing signed by the party against which enforcement of such change or modification is sought.

M.     This Lease shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereto.

N.     If either party hereto is made or otherwise becomes a party to any litigation commenced by or against the other party involving the enforcement of any of the rights and remedies of such party, or arising on account of the default of the other party in the performance of such party's obligations hereunder, then the prevailing party in any such litigation, shall receive from the other party all costs and reasonable attorneys' fees incurred by such party at trial and on appeal in connection with such litigation.

## 43.    CERTIFICATE OF OCCUPANCY

Tenant shall not at any time use or occupy the Premises in violation of the certificate of occupancy issued for the Premises or for the Building and, in the event that any department of the City of New York or State of New York shall hereafter at any time contend and/or declare by notice, violation, order or in any other manner whatsoever that the Premises are used for a purpose which is a violation of such certificate of occupancy, Tenant shall, upon five (5) days' notice from Landlord, immediately discontinue such use of the Premises. In addition, Landlord shall not make any changes to the Certificate of Occupancy that would affect Tenant's Intended Use of the Premises.

## 44.    SECURITY DEPOSIT

A.    Simultaneous with the execution hereof, Tenant shall deposit with Landlord, the sum equal to three (3) month's Fixed Rent (the "Security Deposit") in cash or by Letter of Credit (as defined below) in substantially the form of Exhibit E, attached hereto and made a part hereof, or such other form as Landlord shall approve in its reasonable discretion, as security for the faithful performance, observance and compliance with all of the terms, covenants and conditions of this Lease on Tenant's part to perform, observe or comply with. (For clarification, Tenant may substitute such Letter of Credit with cash or vice versa, upon reasonable notice to Landlord and Landlord shall cooperate with Tenant with respect to such replacement, without cost or liability to Landlord). If the Security Deposit shall be by Letter of Credit, Tenant agrees that, in the event that Tenant defaults under any of the terms, covenants or conditions in this Lease on Tenant's part to observe, perform or comply with (including, without limitation, the payment of any installment of Fixed Rent or any amount of Additional Rent), which default continues after any notice and applicable grace periods required under this Lease and the expiration of any applicable cure period, Landlord may notify the Issuing Bank (defined below) and thereupon receive all of the monies represented by the said Letter of Credit and use, apply, or retain the whole or any part of the Security Deposit to the extent required for the payment of any Fixed Rent, Additional Rent, or any other sums as to which Tenant is in default, or for any sum that Landlord may expend or may be required to expend by reason of any such default (including any damages or deficiency accrued before or after summary proceedings or other re-entry by Landlord). In the event that Landlord applies or retains any portion or all of such Security Deposit the amount not so used, applied or retained shall continue to be treated as Tenant's Security Deposit, and Tenant shall restore the amount so applied or retained within five (5) business days after Landlord's demand therefor, so that, at all times, the amount held by Landlord shall be the full amount of the Security Deposit by delivering to Landlord additional cash or a substitute Letter of Credit. In the event that Tenant shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of this Lease, that portion, if any, of the Security Deposit (whether cash or Letter of Credit) not used, applied or retained shall be returned to Tenant no later than thirty (30) days after the later of (x) Expiration Date (or such earlier date upon which the Lease may terminate) and (y) delivery of possession of the demised premises to Landlord, in accordance with, and subject to, the applicable provisions of this Lease.

B.    (i)    The letter of credit (the "Letter of Credit") to be delivered as the Security Deposit under this Article 44 shall be a clean, irrevocable and unconditional letter of credit issued by and drawn upon a commercial bank (hereinafter referred to as the "Issuing Bank")

with offices for banking purposes in the City of New York having assets of not less than One Billion Dollars ($1,000,000,000.00), which Letter of Credit shall have a term of not less than one year, be automatically renewable, be in a form reasonably approved by Landlord, be for the account of Landlord and be in the amount of the Security Deposit. The Letter of Credit shall provide that:

(ii)    The Issuing Bank shall pay to Landlord an amount up to the face amount of the Letter of Credit upon presentation of: (1) the Letter of Credit and a sight draft in the amount to be drawn and (2) a written statement certifying that Landlord, by the terms of this Lease, is entitled to draw on said Letter of Credit;

(iii)    The Letter of Credit shall be deemed to be automatically renewed, without amendment, for consecutive periods of one (1) year each during the Term, unless the Issuing Bank sends written notice (hereinafter called the "Non-Renewal Notice") to Landlord by certified or registered mail, return receipt requested, not less than thirty (30) days prior to the then expiration date of the Letter of Credit with an ultimate expiration no earlier than thirty (30) days after the Expiration Date of the Lease, that it elects not to have such Letter of Credit renewed; and

(iv)    The Letter of Credit shall be transferable by the beneficiary thereof, without charge, and any failure of Tenant, or any of its successors or assigns as permitted under this Lease, to pay any transfer charges shall not affect the beneficiary's ability to transfer the Letter of Credit. The Letter of Credit may be transferred as aforesaid from time to time, by the then beneficiary under the Letter of Credit. To effectuate a transfer under the Letter of Credit, the beneficiary must notify the Issuing Bank in writing, signed by an authorized signatory of beneficiary, of the name and address of the transferee and of the effective date of the transfer. Upon the Issuing Bank's receipt of such writing, the Issuing Bank will issue an amendment to the Letter of Credit that changes the name and address of the beneficiary hereof and shall deliver the original of such amendment to the new beneficiary/transferee and a copy thereof to the prior beneficiary/transferor.

(v)    In the event that the Issuing Bank sends a Non-Renewal Notice, Tenant shall have five (5) business days from the date of issuance thereof to provide Landlord with a substitute Letter of Credit which meets the requirements of this Article 44. In the event that Tenant fails within such period to provide Landlord with a substitute Letter of Credit, Landlord shall have the right, exercisable in accordance with this Article 44 and without any notice to Tenant, draw down on the Letter of Credit, which moneys shall be held by Landlord as a cash deposit subject to Landlord's right to use such cash funds, at Landlord's sole option, for purposes of having issued, on Tenant's behalf, a substitute Letter of Credit.

C.    In the event of a sale or transfer of the Property, the Building or the then Landlord's interest therein or a leasing by the then Landlord of any of same, Landlord shall have the right, at no cost or expense to Landlord, to transfer or assign such Security Deposit to the vendee, transferee or lessee, and Landlord shall notify Tenant, by certified mail, return receipt requested, of such sale, transfer or lease, together with the name and address of such vendee, transferee or lessee, and Landlord shall thereupon be released by Tenant from all liability for the return of such Security Deposit. In such event, and subject to the satisfaction of the foregoing requirements, Tenant agrees to look solely to the new landlord for the return of said Security

41

Deposit. In connection with the foregoing, Tenant shall reasonably cooperate with Landlord and such vendee, transferee or lessee in connection with the transfer or assignment of such Security Deposit including, without limitation, executing and delivering, within ten (10) days after demand therefor, any and all instruments, certificates, agreements or other documents that Landlord, such vendee, transferee or lessee the Issuing Bank (in the case that the Security Deposit is then comprised of a Letter of Credit) may reasonably require.

D.     Tenant covenants that it will not assign or encumber, or attempt to assign or encumber, the Security Deposit, and that neither Landlord nor its successors or assigns shall be bound by any such assignment, encumbrance, attempted assignment, or attempted encumbrance.

E.     In the event that at any time during the Term, the Issuing Bank files for protection under any chapter of the United States Bankruptcy Code or the bankruptcy code of the state or county of its formation or is seized by the appropriate regulatory authorities of the State of New York, the United States or the state or nation of its formation and as a result thereof is incapable of or unable to, or prohibited from honoring the then existing Letter of Credit (hereinafter referred to as the "Existing L/C") then, upon the happening of the foregoing, Landlord may send written notice to Tenant (hereinafter referred to as the "Replacement Notice") requiring Tenant within thirty (30) days to replace the Existing L/C with a new letter of credit (hereinafter referred to as the "Replacement L/C") from an Issuing Bank meeting the qualifications described in this Article 44. Upon receipt of a Replacement L/C meeting the qualifications of this Article 44, Landlord shall simultaneously return the Existing L/C to Tenant. In the event that a Replacement L/C meeting the qualifications of this Article 44 is not received by Landlord within the time specified, the Existing L/C may be presented for payment by Landlord and the proceeds thereof shall be held by Landlord in accordance with this Article 44.

F.     In the event that the Issuing Bank's credit rating is reduced below P-2 (or equivalent) by Moody's Investors Service, Inc. or below A-2 (or equivalent) by Standard Poor's Corporation (the "Minimum Rating Requirement"), then Landlord shall have the right to require that Tenant obtain from a different issuer a Replacement L/C that complies in all respects with the requirements of this Article 44, and Tenant's failure to obtain such a Replacement L/C within thirty (30) days following Landlord's written demand therefor (with no other notice or cure or grace period being applicable thereto, notwithstanding anything in this Lease to the contrary) shall entitle Landlord to immediately draw upon the then Existing L/C in whole or in part, without notice to Tenant. In the event the issuer of any Letter of Credit held by Landlord is placed into receivership or conservatorship by the Federal Deposit Insurance Corporation or any successor or similar entity, then, effective as of the date such receivership or conservatorship occurs, said Letter of Credit shall be deemed to not meet the requirements of this Article 44, and, within thirty (30) days thereof, Tenant shall replace such Letter of Credit with other collateral acceptable to Landlord in its sole and absolute discretion (and Tenant's failure to do so shall, notwithstanding anything in this Lease to the contrary, constitute an Event of Default hereunder for which there shall be no notice or grace or cure periods being applicable thereto other than the aforesaid thirty (30) day period). If at any time during the Term there is no Issuing Bank that satisfies the Minimum Rating Requirement from which Tenant is able to obtain, at a commercially reasonable cost, a Replacement L/C, then Landlord may draw down the full amount of the Existing L/C (unless Tenant posts cash security equal to the amount of the Security Deposit within ten (10) days after written notice that Landlord intends to draw down on the Existing L/C) and retain the proceeds

thereof as substitute security, subject to the provisions of this Article 44, provided that Landlord shall invest any amounts so drawn or otherwise posted by Tenant and not immediately thereafter applied to cure any default or to pay damages then due and payable in a mutual fund designated by Landlord that invests solely in U.S. Treasury bills. Following any such draw by Landlord, Tenant may, and at Landlord's option shall, obtain a Replacement L/C in the amount of the Security Deposit from a bank that satisfies the Minimum Rating Requirement and upon issuing of same to Landlord, Landlord shall immediately return such funds drawn by Landlord in accordance with this Article 44. With respect to any cash security held by Landlord hereunder, Tenant agrees that Landlord may deposit same in a non-interest bearing account, commingled with other security deposits and Landlord shall have the right to withdraw such sum from time to time, when and as Landlord shall determine in its sole discretion pursuant to the provisions hereof.

### 45.    INTENTIONALLY OMITTED.

### 46.    GUARANTY OF LEASE.

The obligations and the liabilities of the Tenant hereunder shall be personally guaranteed by Jonathan Elfand, as principal shareholder of Tenant, pursuant to the provisions of separate personal guaranty in the form annexed hereto as Exhibit "D".

### 47.    DEMOLITION.

At any time following the first sixty (60) months of the term of this Lease, Landlord (or its successors or assigns) shall have the option and right to terminate this Lease in the event Landlord shall intend to demolish or to majorly rehabilitate the Building (the "Termination Option"), provided that Landlord shall give notice to Tenant of Landlord's exercise of the Termination Option not later than twelve (12) months prior to the proposed termination date to be set forth in such notice. In addition, Landlord shall furnish sufficient documentation to Tenant demonstrating Landlord's good faith plans to demolish or majorly rehabilitate the Building. In the event Landlord shall give such notice of termination to Tenant pursuant to this Article, then, in such event, this Lease shall come to an end and expire on the termination date set forth in the notice of termination with the same force and effect as though said termination date were the original expiration date under the Lease (as extended herein), unless sooner terminated pursuant to any other term, covenant or condition of this Lease, or pursuant to Law, and Tenant shall vacate and surrender the Premises to the Landlord by the date specified in the termination notice, broom-clean and otherwise in accordance with the other applicable provisions of the Lease, and Tenant shall pay to Landlord all sums due through the date Tenant vacates. In the event Landlord elects to terminate the Lease pursuant to this Section 47, upon Tenant vacating and surrendering the Premises to Landlord in accordance with the terms specified herein, Landlord shall pay Tenant a sum equal to the unamortized cost of Tenant's capital improvements made to the Premises in connection with this Lease, if any, provided that Tenant has provided documentation as to such costs withing ninety (90) days of the date of this Lease. Such capital improvements must have been approved by Landlord as required herein, verified, and shall be amortized over a period in accordance with generally accepted accounting principles, but in no event over a period longer than the Term of this Lease.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease on the date first above written.

BNN FULTON FLUSHING OWNER, LLC

By: _____

Name: _____

Title: _____

Elfand Organization LLC DBA: Empire Cannabis Club/Door to Door 420

By: _____

Name: Jonathan Elfand

Title: _____

44

## EXHIBIT A

<u>DEMISED PREMISES</u>

Subject to Article 45 hereof, all internal areas of the Building (including, by way of example, windows, storefronts, exits and entrances) commonly known as 446-448 Fulton St., Brooklyn, NY (on the tax maps of Kings County, Block 156, Lot 26).  For clarity, no portion of the roof is leased hereunder; it being understood and agreed that Landlord reserves the right to utilize such portions of the roof as Landlord may in the future determine for the installation of cellular type antennae and appurtenant equipment and to connect such equipment (utilizing chases, conduits or internal columns within the Building or on the external side of the Building) to electrical services otherwise servicing the Building (provided, however, that electrical charges in respect of such services shall in no event be payable by Tenant hereunder).

## EXHIBIT B

## PROHIBITED USES

As used in this Lease, the term "Prohibited Uses" shall mean any of the following uses:

Any use which unreasonably emits or results in strong, unusual or offensive odors, fumes, dust or vapors (provided, however, the use as a cosmetic/fragrance store shall not be deemed unusual or offensive), is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse. Odors created by Tenant's permitted use hereunder shall be permitted unless and untilany such odors create a public or private nuisance.

Any operation primarily used as a storage facility and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

Any "second hand" store, "surplus" store, "99 cent" store, or low end discount store or flea market;

Any central laundry, dry cleaning store, or laundromat;

Any live performance theater, auditorium, meeting hall, sporting event, or other entertainment use including, but not limited to, a cabaret, movie theater, excluding parties and events;

Any living quarters, sleeping apartments, or lodging rooms;

Any veterinary hospital or offices or animal raising or boarding facilities or pet shop, provided, nothing contained herein shall be deemed to prohibit a national pet store chain;

Any mortuary or funeral home or chapel;

Any "Pornographic Use", which shall include, without limitation: (x) a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational or similar to those sold in first-class national bookstores; or (y) a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto;

Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

Any bar, tavern, liquor store or other establishment selling alcoholic beverages for on- or off-premises consumption;

Any amusement or video arcade or other business deriving income from coin operated games, shooting gallery, slot machines pinball machines or related equipment; ping pong parlor; pool or billiard hall; night club, discotheque, dance hall, social club or other club; or recreation or community center; or carnival, amusement park or circus;

Any training or education facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by any tenant incidental to the conduct of its business at the Building;

Any gambling facility or operation, including but not limited to: off-track or sports betting parlor; table games such as black jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall.

Any pawn shop, gun shop, or tattoo parlor;

Any church or other place of religious worship or spiritualist services;

Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lithe oil change service, tire center or gasoline or service station or facility

Any check cashing service store;

Daycare center;

Karate center;

Agency, Department or Bureau of any governmental authority;

Auction House or for the conduct of a public auction of any kind;

Dating or Escort Service;

Employment Agency;

Medical or Dental services;

Fund raising or solicitation for other purposes by means of telephone "bank" calls to the public from the Premises;

Gypsy, Fortune Teller or Palm Reader or Card Reader;

Massage Parlor;

Messenger Service;

Municipal or other Government Office;

-2-

Office (supporting office incidental and ancillary to a retail store excepted), Store, Reading room, Headquarters, Center or other facility devoted or opposed to the promotion, advancement, representation, purpose or benefit of: (a) any political party, political movement or political candidate, (b) any religion, religious group or religious denomination, (c) any foreign governmental;

Roller or Ice Skating Rink or Bowling Alley;

Social Services Center;

Teen Center;

Telephone or Telegraph Agency;

Tombstones, Monuments; and

Public stenographic/public typist.

## EXHIBIT C

## COMMENCEMENT DATE AGREEMENT

THIS COMMENCEMENT DATE AGREEMENT (this "Agreement"), made as of the 22 day of March, 2028, by and between BNN FULTON FLUSHING OWNER LLC ("Landlord") and Elfand Organization LLC ("Tenant").

W I T N E S S E T H:

WHEREAS, Landlord and Tenant have entered into that certain Lease dated March 22, 2028 (the "Lease") for premises located at 446-448 Fulton St., New York; and

WHEREAS, Landlord and Tenant wish to set forth their agreement as to the commencement date of the Term of the Lease.

NOW, THEREFORE, in consideration of the Premises as described in the Lease and the covenants set forth therein, Landlord and Tenant agree as follows:

1.    The Initial Term of the Lease commences on April 1, 2023

2.    The Initial Term of the Lease shall expire on March 31, 2033

3.    Tenant has one (1) option of five (5) years which is to be exercised by the presentation of notice to Landlord not less than nine (9) months nor more than eighteen (18) months prior to the expiration of the Initial Term.

4.    The Rent Commencement Date under the Lease is July 30, 2023

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

LANDLORD:

BNN FULTON FLUSHING OWNER LLC

By:_____

TENANT:

Elfand Organization LLC

By:_____

**EXHIBIT D**

**GUARANTY**

THIS GUARANTY is made as of the *22* day of *March*, 202*3*, by Jonathan Elfand, residing at 235 West 56th Street Apartment # 25E New York, NY 10019 (hereinafter collectively referred to as "Guarantors") for the benefit of BNN Fulton Flushing Owner, LLC (the "Landlord"), having an office at c/o Braha Industries, 10 West 33 St., Suite 220, New York, NY 10001.

## W I T N E S S E T H:

**WHEREAS,** contemporaneously herewith, Landlord is entering into a lease (the "Lease") with Elfand Organization LLC DBA: Empire Cannabis Club/Door to Door 420 (the "Tenant"), a NY corporation, for certain premises located at 446-448 Fulton St., Brooklyn, NY which premises are more particularly described in the Lease (the "Premises"); and

**WHEREAS,** Guarantors are a principal owners of Tenant; and

**WHEREAS,** Landlord is unwilling to enter into the Lease with Tenant unless Guarantors execute and delivers this Guaranty for the benefit of Landlord.

**NOW, THEREFORE,** in order to induce Landlord to enter into the Lease with Tenant, Guarantors agrees as follows:

A.      Guarantors individually, jointly and severally hereby guarantee to Landlord:      (i) the due and punctual payment in full (and not merely the collectability) of all rents, additional rents and all other amounts and obligations due and payable by Tenant under the Lease; and (ii) the due and punctual performance and/or observance of all of the other terms, covenants and conditions contained in the Lease on part of Tenant to be performed or observed.

B.      Guarantors expressly agrees that Landlord may, in its sole and absolute discretion, without notice to or further assent of Guarantors and without in any way releasing, affecting or impairing the obligations and liabilities of Guarantors hereunder: (i) waive compliance with, or any default under, or grant any other indulgences with respect to, the Lease; (ii) by agreement between Tenant and Landlord, modify, amend or change any provisions of the Lease;  (iii) grant extensions or renewals of the Lease and/or effect any release, compromise or settlement in connection therewith;  (iv) agree to the substitution, exchange, release or other disposition of all or any part of the Premises; (v) make advances for the purpose of performing any term or covenant contained in the Lease, with respect to which Tenant shall be in default; (vi) assign or otherwise transfer its interest in the Premises or in this Guaranty or any interest therein or herein; (vii) consent to an assignment, conveyance, extinguishment or other transfer of all or any part of the interest of Tenant in the Lease; and (viii) deal in all respects with Tenant as if this Guaranty were not in effect.

66938335v.5

C.    The liability of Guarantors under this Guaranty shall be primary, direct and immediate and not conditional or contingent upon pursuit by Landlord of any remedies it may have against Tenant with respect to the Lease. Without limiting the generality of the foregoing, Landlord shall not be required to make any demand on Tenant, or otherwise pursue or exhaust its remedies against Tenant before, simultaneously with or after enforcing its rights and remedies hereunder against Guarantors. Any one or more successive and/or concurrent actions and/or proceedings may be brought hereon against Guarantors either in the same action and/or proceeding, if any, brought against Tenant, or in separate actions and/or proceedings, as often as Landlord, in its sole discretion, may deem advisable.

D.    Notwithstanding anything to the contrary contained herein, and provided Tenant shall not be, or have been at any time, in default of any term, condition and/or provision of the Lease on the part of Tenant to be performed, after the first twenty four (24) months of the Term of the Lease with Tenant making timely payments of Fixed Rent and Additional Rent, and provided Tenant shall (i) give Landlord not less than none (9) months' prior written notice of its intent to surrender and vacate the Premises by providing Landlord with a duly executed and Surrender Declaration (the "Surrender Declaration") in the form annexed hereto, and (ii) shall have delivered all keys to the Premises to Landlord no later than the Surrender Date (as defined in the Surrender Declaration), and (iii) shall have vacated and surrendered the Premises no later than the Surrender Date, as if the Lease had come to its end and expired, having paid all Basic rent and Additional Rent due through the Surrender Date and having fulfilled all of its other obligations through such Surrender Date, and (iv) shall have paid Landlord a sum equal to the then unamortized lease commission paid by Landlord to Broker in connection with this Lease (amortized on a straight line basis, over the ten (10) year initial term of the Lease) then, in such event, Guarantors shall be released from and shall have no liability with respect to any obligations of Tenant under the Lease arising or accruing after the Surrender Date but Guarantors shall continue to remain liable pursuant to the terms of this Guaranty for (i) all obligations of Tenant which arose or accrued on or prior to the Surrender Date and (ii) any unearned lease commission paid to Broker in connection with this Lease and (iii) any liability of Tenant arising out of breach of any warranty or representation of Tenant under the Surrender Declaration.

E.    Guarantors hereby expressly waives for itself: (i) presentment and demand for payment and protest of non-payment; (ii) notice of acceptance of this Guaranty and of presentment, demand and protest; (iii) notice of any default hereunder or under the Lease and of all indulgences; (iv) demand for observance or performance of, or enforcement of, any terms or provisions of this Guaranty or the Lease; and (v) all other notices and demands otherwise required by law which Guarantors may lawfully waive. Guarantors also waives trial by jury in any action brought on or with respect to this Guaranty.

F.    If Guarantors shall advance any sums to Tenant or its successors or assigns or if Tenant shall hereafter become indebted to Guarantors, such sums and indebtedness shall be subordinate in all respects to the amounts then or thereafter due and owing to Landlord under the Lease. Nothing herein contained shall be construed to give Guarantors any right of subrogation in and to Landlord's rights under or interest in the Lease until all amounts owing to Landlord under the Lease have been paid in full.

G.      Every notice, approval, consent or other communication authorized or required by this Guaranty ("Notice") shall not be effective unless it is in writing and sent by United States registered or certified mail, return receipt requested or via an overnight delivery service such as Federal Express or UPS, directed, if to Guarantors, at the address set forth above with a copy to Tenant at the Premises or if to Landlord, at the address hereinabove set forth, or such other address or such other agent as either party may designate by notice from time to time in the manner aforesaid.

Notices shall be deemed given upon receipt, except in the event of refusal by the addressee to accept a Notice or if the is not deliverable, the Notice shall be deemed given upon the date of mailing.

H.      All rights and remedies afforded to Landlord by reason of this Guaranty, and the Lease, or by law are separate and cumulative and the exercise of one shall not in any way limit or prejudice the exercise of any other such rights or remedies. No delay or omission by Landlord in exercising any such right or remedy shall operate as a waiver thereof. No waiver of any rights and remedies hereunder, and no modification or amendment hereof, shall be deemed made by Landlord or Guarantors unless in writing and duly signed by Landlord and Guarantors. Any such written waiver shall apply only to the particular instance specified therein and shall not impair the further exercise of such right or remedy or of any other right or remedy of Landlord or Guarantors, and no single or partial exercise of any right or remedy hereunder shall preclude other or further exercise thereof of any other right or remedy.

I.      This Guaranty shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be wholly performed within the State of New York. In any action brought under or arising out of this Guaranty, Guarantors hereby consents to the jurisdiction of any competent court within the State of New York, including, without limitation, federal courts of the United States of America. If Landlord engages an attorney to (i) enforce its rights hereunder and/or under the Lease or (ii) to compel Guarantors or Tenant to perform their respective obligations hereunder and/or under the Lease, and secures a final unappealable judgment, Guarantors shall pay all of Landlord's costs and expenses (including attorneys' fees and disbursements) incurred by or on behalf of Landlord in connection therewith upon demand.

J.      This Guaranty shall inure to the benefit of, and shall be enforceable by, Landlord and its successors and assigns and shall be binding upon, and enforceable against, Guarantors, his executors, representatives, estate and heirs. As used in this Guaranty, the term "Landlord" shall be deemed to include any assignee of Landlord's interest in the Lease and this Guaranty.

K.      Guarantors warrants and represents to Landlord that (i) this Guaranty has been voluntarily, knowingly and competently into by Guarantors, (ii) this Guaranty represents the valid and binding obligation of Guarantors and is enforceable against Guarantors in accordance with its terms, and (iii) Guarantors are the principal owners of Tenant.

L. Following the commencement of sixth (6th) Year of the Term, Guarantor may be

replaced by an affiliated entity of Tenant ("Corporate Guarantor") with a guaranty, upon Landlord's consent which shall not be unreasonably withheld, provided that:

(i)        No Event of Default has occurred and is then continuing;

(ii)       Tenant shall provide to Landlord the proposed Corporate Guarantor's financial statements, audited by a certified public accountant in accordance with generally accepted accounting principles, consistently applied, that indicate that such Corporate Guarantor has a tangible liquid net worth reasonably satisfactory to Landlord, and gives to Landlord, such other information that Landlord, in its reasonable judgment, determines is necessary to provide adequate assurance of the performance by such proposed Corporate Guarantor; provided, however, that in no event shall such adequate assurance of future performance be less favorable to Landlord than the assurance of Guarantor herein;

(iii)      In the event that at any time during the remaining term of the Lease, the financial strength of Corporate Guarantor is reduced below the level as established in (ii), then the personal guaranty of Guarantor shall be reinstated; and

(iv)       Corporate Guarantor executes and delivers to Landlord a guaranty in a form reasonably acceptable to Landlord.

    **IN WITNESS WHEREOF,** Guarantors has duly executed this Guaranty as of the day and year first above written.

Witness:

_____

                                _____
                                  Jonathan Elfand, Guarantor
                                  SS# _____

**ACKNOWLEDGEMENT**

    STATE OF NEW YORK       }
                                } ss.:
    COUNTY OF _New York_  }

    On this _14_ day of _March_, 2023, before me came Jonathan Elfand, to me known to be the individuals described in the foregoing instrument, who executed said instrument and who acknowledged to me that they executed the same.

SAMUEL CALVO
Notary Public, State of New York
No. 01CA6763729
Qualified in Kings County
Commission Expires June 11, 2024

_____
Notary Public

## SURRENDER DECLARATION

SURRENDER DECLARATION dated this _____ day of _____,
20\_\_, by _____, a _____, having an office at
_____ (hereinafter referred to as "Tenant").

## W I T N E S S E T H:

**WHEREAS,** ("Landlord") and Tenant heretofore entered into a certain written lease (the "Lease") dated as of _____ wherein and whereby Landlord leased to Tenant and Tenant hired from Landlord certain premises (the "Premises") located at 446-448 Fulton St., Brooklyn, NY, as more fully described in the Lease, for a term scheduled to terminate on the Termination Date, as defined in the Lease, at a rental and additional rental and upon the covenants, conditions, provisions and agreements contained in the Lease; and

**WHEREAS,** Tenant desires to surrender the Premises on _____, 20\_\_ (hereinafter referred to as the "Surrender Date") on which date Tenant shall deliver all keys to the Premises to Landlord and shall vacate and surrender the Premises in accordance with the Lease as if the term of the Lease had come to its end and expired.

**NOW, THERFORE,** in consideration of the premises, Tenant hereby declares, covenants and agrees as follows:

(1)     Effective as of the Surrender Date, Tenant hereby surrenders to Landlord all of Tenant's right, title and interest in and to the Premises and the Lease, together with all alteration, installations, additions and improvements in and to the Premises, to the intent and purpose that the estate of Tenant in and to the Premises shall be wholly extinguished as of the Surrender Date.

(2)     Tenant hereby warrants and represents to Landlord that as of the Surrender Date (a) nothing has been done or suffered by Tenant whereby the Lease, the Premises or any part thereof, have been encumbered in any way whatsoever; (b) that no other than Tenant has acquired through or under Tenant any right, title or interest in and to the Lease or the term and estate thereby granted or in and to all or any part of the Premises; and (c) Tenant has vacated the Premises in accordance with the Lease as if the term of the Lease had come to its end and expired.

(3)     The delivery of this Surrender Declaration to Landlord shall not affect any liability or obligation of Tenant under the Lease and should not be construed to diminish, limit or otherwise reduce any liability or obligation that Tenant would otherwise have under the Lease if this Surrender Declaration was never executed and delivered to Landlord.

66938335v.5

(4)    The covenants, conditions, provisions and agreements contained in this Surrender Declaration shall bind Tenant, its successor and assigns and inure to the benefit of the Landlord, and its successors and assigns.

**IN WITNESS WHEREOF,** the Tenant has hereto executed this Surrender Declaration as of the day and year first above written.

TENANT:

_____

By: _____

STATE OF NEW YORK          }
                          } ss.:
COUNTY OF _____}

On the \_\_\_\_\_ day of _____, 20\_\_\_, before me personally came _____ to me known, who being by me duly sworn, did depose and say that he/she resides in _____; that he/she is the _____ (president or other officer, director or attorney in fact duly appointed) of _____ the corporation described in and which executed the above instrument; that he/she knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was affixed by authority of the board of directors of said corporation, and that he/she signed his/her name thereto by like authority.

_____
Notary Public

**EXHIBIT E**

**FORM OF LETTER OF CREDIT**

[NAME AND OFFICE OF ISSUING BANK]

IRREVOCABLE AND TRANSFERABLE

LETTER OF CREDIT

LETTER OF CREDIT NO. _____ Date: _____, 20__
AMOUNT: $_____

BNN FULTON FLUSHING OWNER LLC
c/o Braha Industries
10 West 33rd St., Suite 220, New York, NY 10001

   Re: Lease dated _____ between _____ and _____ ("Tenant").

Gentlemen:

   We hereby open our Irrevocable and Transferable Letter of Credit No. _____ in your favor for the account of _____ in an aggregate amount of up to $_____. We hereby irrevocably authorize you to draw on us in accordance with the terms and conditions hereinafter set forth by one (1) or more demands for payment in an aggregate amount not exceeding the foregoing amount. Partial drawings under this Letter of Credit are permitted.

   Any demand for payment and all other communications relating to this Letter of Credit shall be in writing and addressed and presented by hand or by reputable overnight courier or by certified mail or registered mail, return receipt requested to our Letter of Credit Section at our office at _____, New York, New York and shall make specific reference to this Letter of Credit by number. Demand for payment under this Letter of Credit may be made prior to its expiration at any time during business hours at the foregoing office on a day (a "Business Day") on which we are open for the purpose of conducting commercial banking business.

   This Letter of Credit shall expire at 5:00 P.M., Eastern Standard Time, on _____ or, if such day is not a Business Day, then on the next day following which is a Business Day. This Letter of Credit shall be considered automatically extended without amendment for periods of one year from the present or any future expiration date unless we notify you in writing at your address set forth above (or in any transfer instruction, if applicable) presented by hand or by reputable overnight courier or by certified mail or registered mail, return receipt requested, not less than sixty (60) days prior to any such expiration date that we elect not to consider this Letter of Credit renewed for any such additional period.

This letter of credit may be transferred one or more times in its entirety without our consent and without cost to you upon presentation to us of (i) a written transfer instruction signed by you and naming the transferee and (ii) the original of this letter of credit. Upon such presentation, we shall issue a replacement letter of credit in favor of the transferee in the form of this letter of credit. No other documents or presentations will be required by us in connection with any such transfer. Any and all transfer fees shall be charged to the account of Tenant.

This Letter of Credit sets forth in full our undertaking and such undertaking shall not in any way be modified, amended, amplified or limited by reference to any document, instrument or agreement referred to herein; and any such reference shall be limited to the matter referred to and shall not be deemed to incorporate herein by reference any such document, instrument or agreement. This Letter of Credit may not be amended without your written consent.

This letter of credit is issued subject to, and shall be governed by, the International Standby Practices 1998, International Chamber of Commerce Publication No. 590.

Very truly yours,

[Name of Issuing Bank]

By:_____
**Name:**
 **Title:**

66938335v.5